**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Jason Rains, David Cerutti, Paige Bishop, Carlos Guidorizzi, Heather Richards, and Brian Gresh, *on behalf of themselves and all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> Jaguar Land Rover Automotive, PLC and Jaguar Land Rover Limited, <br><br> Defendants. | Civil Action No.: <br><br> **CLASS ACTION COMPLAINT** |

Plaintiffs, Jason Rains, David Cerutti, Paige Bishop, Carlos Guidorizzi, Heather Richards, and Brian Gresh ("Plaintiffs"), by undersigned counsel, bring the following Class Action Complaint against Defendants Jaguar Land Rover Automotive, PLC and  Jaguar Land Rover Limited, and allege, on their own behalf and on behalf of all those similarly situated, as follows:

## INTRODUCTION

1.      Plaintiffs bring this lawsuit on behalf of themselves and proposed classes of past and present owners and lessees of defective 2020-2022 Land Rover Defender vehicles (collectively the "Class Vehicles") manufactured, designed, marketed, distributed, and sold by Defendants Jaguar Land Rover Automotive, PLC ("JLR PLC") and Jaguar Land Rover Limited ("JLR LTD," and together with JLR PLC, "Land Rover UK" or "Defendants"),.

2.      Plaintiffs and the Classes were damaged because the Class Vehicles contain defective windshields.

3.      Defendants are responsible for manufacturing, developing, designing and marketing the Class Vehicles, the Defendants' overall management strategy and operations, and

overseeing risks facing the Defendants globally, including Defendants' North American operations via Jaguar Land Rover North America ("JLRNA").

4.     Land Rover UK sold the Class Vehicles to purchasers across the United States via JLRNA, which is headquartered and located in New Jersey and primarily serves as Land Rover UK's United States store front through which Land Rover UK conducts business in the United States. JLRNA, in turn, primarily distributes, markets and sells the Class Vehicles to United States purchases via its network of dealerships, issues warranties regarding the Class Vehicles, and services and repairs those vehicles in accordance with instructions and directives coming from Land Rover UK.   Thus, JLR PLC oversees strategy and plans, and JLR LTD designs and builds the vehicles, that are marketed and sold to United States purchasers via JLRNA.  Each act of JLRNA is an act by and for Land Rover UK. Although the Defendants' exact roles, and the extent to which they overlapped, will be revealed in discovery, in light of the Defendants' relationships, they are jointly and severally liable for the claims set forth herein.

5.     Beginning as early as 2019 Defendants knew that the Class Vehicles contain one or more defects in the way the vehicles are manufactured and/or made that can cause the windshield to crack, chip and/or fracture (the "Defect"). Upon information and belief, the Defect occurs due to either deficient materials used to make the windshield itself and/or a deficiency in installation of the windshields and/or the structure of the Class Vehicles.

6.     Class Vehicle owners report that their windshields failed for no reason at all. Others have reported windshield failure as a result of circumstances that would not cause a non-defective windshield to fail, such as a very slight impact.

7.     Land Rover UK, however, has refused to repair or replace the defective windshields in the Class Vehicle under JLRNA's warranty, requiring that Class Vehicle owners

pay hundreds or thousands of dollars to repair the Defect – even where the Defect occurs nearly immediately after Class Vehicle owners take possession of their vehicles.

8.      In addition, the replacement windshields provided by Defendants (which Class Vehicle owners must pay for out-of-pocket) are also defective and as a result, Class Vehicle owners often must repeatedly replace their windshields:

- NHTSA Complaint No. 11439152, November 3, 2021 (Incident Date May 29, 2021): 2 cracked windshields, car has only 15K miles- TONS of Defender owners on FB groups and forums same- some one 4th and 5th windshields- current wait to new ones from UK is 2-4 months. […]

9.      Further, the Defect can and often does manifest immediately after Class Members take ownership of the vehicles and Class Vehicle have complained that they experienced the Defect within weeks of acquiring their vehicles:

- NHTSA Complaint No. 11439215, November 3, 2021 (Incident Date September 21, 2021): My windshield broke in only owning this car **30 days** I hear from other people that this is there 3 time replacement. I think this is a design issues and should be looked into.

- NHTSA Complaint No. 11453301, February 21, 2022 (Incident Date February 17, 2022): Easily cracked windshield. **Less than 30 days owned** and a small pebble cracked my windshield.

- NHTSA Complaint No. 11439215, March 20, 2022 (Incident Date April 1, 2021): **Shortly after buying the car** a small people hit the windshield while driving on the highway and broke the windshield right in the eyesight of the driver side. It was a little larger than a quarter in size and took 3 months for replacement due to back order. 2 weeks after the replacement the windshield spontaneously cracked while driving from the middle base of the windshield up and towards the passenger side about 20 inches long. Nothing hit the car, it just cracked. No heater or defrost was on. It took 6 months for replacement due to Land Rover ordering the wrong windshield and back orders. During this time the windshield got 3 more chips from pebbles/small rocks while driving. 2 weeks after this replacement a small rock hit the windshield on the driver side and chipped it about the size of a nickel. I am getting this filled tomorrow. This is clearly a defect with the windshield as I have had maybe 2 broken windshields in my life up to this point.

10.     The Defect poses an extreme safety hazard to drivers, passengers, and pedestrians because a spontaneously shattering or cracking windshield can impair the driver's view, distract the driver, and result in dislodged glass that can injure drivers, passengers and pedestrians. As set forth below the cracks on the Plaintiffs' and other Class Vehicle owners' respective windshields were significant andspread across several feet of the windshields.

11.     Given the inherent safety risks associated with driving a vehicle with a cracked windshield, many states make it illegal to operate a vehicle with a cracked windshield where the windshield is defective such that it impairs the driver's vision. *See, e.g.*,

- *Florida*:

  http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&Search_String=&URL=0300-0399/0316/Sections/0316.2952.html (prohibiting devices or items that might obstruct driver's clear view of the road) (last visited Nov. 21, 2022);

- *California*: California Vehicle Code 26710 ("It is unlawful to operate any motor vehicle upon a highway when the windshield or rear window is in such a defective condition as to impair the driver's vision either to the front or rear."); https://www.revisor.mn.gov/statutes/cite/169.71 (""A person shall not drive or operate any motor vehicle with: (1) a windshield cracked or discolored to an extent to limit or obstruct proper vision") (last visited Jun. 28, 2022);

- *Colorado*: http://www.lpdirect.net/casb/crs/42-4-227.html (prohibits driving a motor vehicle with anything that obstructs driver's view of the road) (last visited Nov. 21, 2022);

- *Louisiana*:

  https://legis.la.gov/Legis/Law.aspx?d=88051#:~:text=(a)%20In%20the%20eight%20and,excess%20of%20one%2Dhalf%20inch (outlawing driving with cracked to chipped windshields) (last visited Nov. 21, 2022);

- *New Jersey*: https://law.justia.com/codes/new-jersey/2018/title-39/chapter-3/section-39-3-74/ (New Jersey law prohibiting drivers to operate vehicles with obstructed view of the road) (last visited Jun. 28, 2022);

- *Utah*: https://le.utah.gov/xcode/Title41/Chapter6A/41-6a-S1635.html?v=C41-6a-S1635_2022050420220504 (Utah law that prohibits damage, scratches or discoloration on windshields if it interferes with driver's clear view of the road) (last visited Jun. 28, 2022);

- *Texas*: https://www.dps.texas.gov/section/vehicle-inspection/faq/faq-items-inspection (Texas vehicles may fail a state required inspection if "a damaged windshield creates a significant visibility issue for the driver.") (last visited Jun. 28, 2022).

12.    Moreover, in the event a vehicle is involved in a collision, an intact windshield assists in transferring the force of a front-end impact down to the chassis, which reduces the effect of the impact felt inside the vehicle and helps protect the passengers. However, where a vehicle's windshield is cracked and then subsequently shatters during a collision, the vehicle occupants are at greater risk of sustaining injuries.

13.    In addition, the windshield is a vital component of a vehicle's safety restraint system, which also includes airbags and seatbelts. These safety features, including the windshield, are all part of a safety network.  Each individual component of this network is

dependent on the others functioning properly. Thus, if there is a compromise or weakness in just one aspect of the network, the likelihood of other parts not working properly is increased. All components of a vehicle's safety restraint system are designed to work together to keep vehicle occupants within the relative safety of the passenger compartment during collision or roll over.

14.     To that end, the windshield provides support that a passenger-side airbag needs to deploy properly. If the windshield is compromised, the airbag may be useless in a collision. Similarly, the windshield provides much of the roof support for most vehicles. As a result, the windshield is a crucial component in preserving the structural integrity of the vehicle's passenger compartment during roll-overs in that the windshield supports the roof, thereby keeping the roof from collapsing and crushing the driver and passengers.

15.     In addition to these safety issues, the cost to repair the Defect can be exorbitant – more than $2,000 for a replacement windshield – requiring consumers to pay significant sums over the life of their Class Vehicles.

16.     As set forth below, Defendants knew the Class Vehicles were defective and not fit for their intended purpose of providing consumers with safe and reliable transportation at the time of the sale and thereafter. Defendants have actively concealed the true nature and extent of the Defect from Plaintiffs and the other Class Members, and failed to disclose it to them, at the time of purchase or lease and thereafter.

17.     Had Plaintiffs and the Class Members known about the Defect, they would not have purchased the Class Vehicles or would have paid substantially less for them.

18.     Despite being notified of the Defect from, among other things, pre-production testing, numerous consumer complaints (to Land Rover dealerships, NHTSA and on Defender-enthusiast websites and Defender Facebook Groups), warranty data, and dealership repair orders,

Defendants have not recalled the Class Vehicles to repair the Defect, have not issued bulletins to its dealerships acknowledging that the Class Vehicles suffer from the Defect, have not offered its customers a suitable repair or non-defective replacement windshield free of charge, and has not offered to reimburse all Class Vehicle owners and leaseholders the costs they incurred relating to diagnosing and repairing the Defect.

19.    Land Rover UK knew of and concealed the Defect that is contained in every Class Vehicle, along with the attendant dangerous safety problems and associated repair costs, from Plaintiffs and the other Class Members both at the time of sale and repair and thereafter.

20.    As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

21.    Plaintiffs have each given Defendants a reasonable opportunity to cure the Defect, but they have refused to cure the defect or otherwise has been unable to do so within a reasonable time.

22.    Land Rover's conduct is in violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.,* the Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq.*, Florida Deceptive and Unfair Trade Practices Act, F.S.A. § 501.201, *et seq.,* California Consumers Legal Remedies Act, Cal. Civil Code §§ 1750, *et seq.*, California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*, and constitutes fraudulent concealment, unjust enrichment, and a breach of implied warranties.

23.    Land Rover UK has and will continue to benefit from its unlawful conduct – by selling more vehicles, at a higher price– while consumers are harmed at the point of sale as their vehicles continue to suffer from the unremedied Defect.

24.    To remedy Land Rover UK's unlawful conduct, Plaintiffs, on behalf of the proposed class members, seek damages and restitution from Land Rover UK, as well as notification to class members about the defect.

## PARTIES

25.    Plaintiff Jason Rains ("Mr. Rains") is an adult individual residing in Phoenix, Arizona.

26.    Plaintiff David Cerutti ("Mr. Cerutti") is an adult individual residing in Tenafly, New Jersey.

27.    Plaintiff Paige Bishop ("Ms. Bishop") is an adult individual residing in Green Cove Springs, Florida.

28.    Plaintiff Carlos Guidorizzi ("Mr. Guidorizzi") is an adult individual residing in Marina Del Ray, California.

29.    Plaintiff Heather Richards ("Ms. Richards") is an adult individual residing in Colorado Springs, Colorado.

30.    Plaintiff Brian Gresh ("Mr. Gresh") is an adult individual residing in Calhoun, Louisiana.

31.    Defendant JLR PLC oversees the management strategy, operation, and risks facing Defendants including for the Defender Class Vehicles.[1] Its annual report confirms it

---

[1] Jaguar Land Rover Automotive PLC Annual Report FY 23/24, available at https://media.production.jlrms.com/2024-06-03/pdf/c6e366ad-90f9-4e85-a034-fd58c68be68b/Annual%20Report%202024%20Document%20Final.pdf?VersionId=J0e5szaNJz.1tPJVS9DQkiadIB eifJsO (last visited June 5, 2024).

oversees, *inter alia,* vehicle design and engineering, supply chain logistics, manufacturing operations, the "global sales network," financial and strategic partnerships,  and the "client service network."[2] JLR PLC monitors and reports the financial statements of Defendants, manages the overall strategy of the companies, allocates capital and the Board evaluates strategy, performance, responsibility and accountability.[3]

32.     JLR PLC considers the "economic, geopolitical, and environmental factors" facing Defendants and creates and manages strategies to navigate those risks.[4]  Although its "Board of Directors are ultimately responsible the management of risk" "the wider organization [including all Defendants] is responsible for the proactive day-to-day management and control of those risks."[5]

33.     JLR PLC at all relevant times directed and controlled the activities of Defendants. According to JLR PLC's most recent annual report, 22% of Land Rover's total global vehicle retail sales were to North American purchasers.[6]

34.     Upon information and belief, JLR PLC is organized under the laws of the United Kingdom and maintains its registered office at Abbey Road, Whitley, Coventry, CV3 4LF, England.

35.     Defendant JLR LTD is the operating company of JLR PLC. It designed, developed and manufactured the Class Vehicles. JLR LTD's "Board of Directors has ultimate responsibility for . . . risk management" and its "Risk and Compliance Committee" oversees "current and emerging risks and monitor[s] the progress of remediation actions towards

---

[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*

acceptable levels of control and exposure."[7]  Principal risks and exceptions are reported by JLR

LTD to the Audit Committee and JLR PLC's Board of Directors "regularly to assist in the

decision-making process and ensure adequate controls are in place to provide sufficient

protection to the organisation."[8] In addition, JLR LTD's Board executes Defendants' "strategy

and ensures the governance principles agree with the [JLR PLC's] Board of Directors, with the

[JLR LTD] Board operating under the direction and authority of the Chief Executive Officer to

support in the execution of the [JLR PLC and its subsidiaries'] strategy, including evaluating

[their] performance against budget and forecast.

36.     The [JLR LTD] Board is also responsible for overseeing the implementation of

appropriate risk assessment processes and controls to identify, manage and mitigate the principal

risks to the [Defendants], and in doing so, provide support to the boards of directors of other

Group companies."

37.     JLR LTD owns and controls JLRNA's website.[9] As part of its ordinary operations

JLR LTD received material information concerning the existence of the Defect including from

JLRNA.  Upon information and belief, JLR LTD is organized under the laws of the United

Kingdom and maintains its registered office at Abbey Road, Whitley, Coventry, CV3 4LF,

England.

---

[7] *Id.*

[8] *Id.*

[9] *See, e.g.,* https://www.landroverusa.com/ownership/warranty.html ("Jaguar Land Rover Limited is constantly seeking ways to improve the specification, design and production of its vehicles, parts, options and/or accessories and alterations take place continually, and we reserve the right to make changes without notice. . Some features may vary between optional and standard for different model year vehicles. The information, specification, engines and colors on this website are based on European specifications and may vary from market to market and are subject to change without notice. Some vehicles are shown with optional equipment and retailer-fit accessories that may not be available in all markets. Please contact your local authorized Land Rover Retailer for availability and prices.") (emphasis supplied).

38.     Non-party Jaguar Land Rover North America, LLC ("JLRNA") is an automobile company that distributes, markets, services, warrants, repairs, sells and leases passenger vehicles – designed and manufactured by JLR PLC and JLR LTD (Land Rover UK) – including the Class Vehicles, in North America.  JLRNA is a wholly owned subsidiary of  JLR PLC.   It maintains its corporate headquarters and principal place of business at 100 Jaguar Land Rover Way, Mahwah, New Jersey 07495.

39.     JLRNA is the sole authorized distributor of Land Rover vehicles in the United States; all Class Vehicles manufactured, developed and designed by Land Rover UK that ended up in the United States did so as a result of JLRNA's relationship Land Rover UK and its role as the American based storefront for Land Rover UK.

40.     In 2016, Defendants announced that  "Jaguar Land Rover, North America, the Mahwah-based arm of British premium automaker Jaguar Land Rover Limited" would begin expanding an office complex in Mahwah, New Jersey to " be the site of its new North American headquarters."[10]

41.     The announcement notes that JLRNA employees in New Jersey "manage[ ] the automaker's business in the United States and Canada" and "provid[e] support" to North American Jaguar and Land Rover retailers.

42.     In an 2018 announcement regarding JLRNA's new Mahwah, New Jersey headquarters, the JLRNA President & CEO noted "[t]he opening of our all new headquarters in

---

[10] https://media.jaguarlandrover.com/en-us/news/2016/09/jaguar-land-rover-expands-new-jersey-presence-move-north-american-headquarters-
new#:~:text=%E2%80%9CTo%20accommodate%20our%20growing%20business,Land%20Rover%20North%20America%2C%20LLC.

New Jersey ushers in a new era for Jaguar Land Rover in North America in which we will have growing sales, expanded model lineups, and breakthrough technology."[11]

43.     Defendants are all wholly-owned subsidiaries of Tata Motors Limited.

44.     At all relevant times, JLRNA acted as the authorized agent, representative, servant, employee and/or alter ego of Land Rover UK while performing activities in the United States including but not limited to advertising, issuing and overseeing warranties, warranty repairs, dissemination of technical information and monitoring the performance of Land Rover vehicles in the United States, including substantial activities that occurred within this jurisdiction.

45.     At all relevant times, Defendants were engaged in the business of designing, manufacturing, marketing, supplying, and selling motor vehicles accompanied by written warranties to the United States public at large through a system of authorized dealerships.

46.     At all times herein mentioned,  Land Rover UK reviews and analyzes warranty data submitted by JLRNA and other Land Rover dealerships and authorized technicians, including United States-based dealerships and technicians, in order to identify defect trends in vehicles. Upon information and belief,  Land Rover UK dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide JLRNA and Land Rover UK with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in the event Defendants decide to audit the dealership.  Defendants use this information to determine whether particular repairs are covered by an applicable Land Rover warranty or are indicative of a pervasive defect.

---

[11] https://media.jaguarlandrover.com/en-us/news/2018/03/jaguar-land-rover-celebrates-opening-new-north-american-headquarters

47.     Land Rover UK also collectively developed the marketing materials to which Plaintiffs and the Classes were exposed, owner's manuals, informational brochures, warranty booklets, and information included in maintenance recommendations and/or schedules for the Class Vehicles, all of which fail to disclose the Defect.

## JURISDICTION AND VENUE

48.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiffs and Class Members are citizens of different states than the Defendants.

49.     Jurisdiction exists over JLR PLC because it is ultimately responsible for the management strategy, operation, and risks facing Defendants. JLR PLC monitors and reports the financial statements of Defendants, manages the overall strategy of the companies, allocates capital and evaluates strategy, performance, responsibility and accountability.

50.     Jurisdiction exists over JLR LTD because JLR LTD's principal activity is the design, development, manufacture and sale of the Class Vehicles at issue in this case.

51.     JLR PLC and JLR JTD have sufficient minimum contacts with this District in light of their incorporation of their subsidiary, JLRNA, in this District, which serves as Land Rover UK's North American headquarters that manages Land Rover UK's business in the United States.  Moreover, Land Rover UK transacts substantial business in this District and their agents are located here. Specifically, Land Rover UK distributes and sells the Class Vehicles to JLRNA – their 100% owners subsidiary – with the understanding and specific goal that JLRNA will then distribute and sell those vehicles to United States Land Rover dealerships and United

States retail purchasers on behalf of Land Rover UK. As noted above, more than 20% of the vehicles designed and manufactured by Land Rover UK were sold in North America, and Land Rover UK solely distributes and sells vehicles to United States purchasers via JLRNA in this District.

52.     Venue is proper in this District because JLRNA, Defendants' United States-based subsidiary and storefront, is headquartered in this District, and Defendants have marketed, advertised, sold, and/or leased the Class Vehicles within this District through numerous dealers doing business in the District.

## FACTUAL ALLEGATIONS APPLICABLE TO INDIVIDUAL PLAINTIFFS

### I.   Jason Rains

53.     On December 29, 2021, Mr. Rains, a resident of Arizona, purchased a new 2022 Land Rover Defender, Vehicle Identification Number SALE37RU3N2094827 (hereafter the "Rains Vehicle") from Jaguar Land Rover Lehi (hereafter "Jaguar Land Rover Lehi"), an authorized Land Rover dealership located in Lehi, Utah.

54.     Passenger safety and reliability were important factors to Mr. Rains' decision to purchase the vehicle. Prior to purchasing the 2022 Land Rover Defender, Mr. Rains researched the vehicle by looking at the vehicle's specifications and features on Land Rover's website, where the Land Rover Defender was described as durable and tough, and was depicted driving in the desert and across sand dunes, suggesting rugged reliability and capability as an offroad vehicle. Based on Land Rover's representations, Mr. Rains was led to believe that the 2022 Land Rover Defender was, among other things, a safe, reliable, and high-quality vehicle, and Land Rover's representations induced him to purchase the vehicle.

55.    Prior to the purchase, Jaguar Land Rover Lehi assured Mr. Rains that the Rains Vehicle was accompanied by Jaguar Land Rover North America, LLC's New Vehicle Limited Warranty.

56.    In its New Vehicle Limited Warranty, JLRNA promised to "correct defects in factory-supplied materials or factory workmanship" without charge within 4 years or 50,000 miles in service, whichever occurs first.

57.    Despite Mr. Rains' research prior to purchasing the vehicle, neither Land Rover nor the selling dealership ever disclosed at the time of purchase that the 2022 Land Rover Defender contained the Defect. Indeed, Land Rover concealed this information from consumers, and Mr. Rains was not aware of, and did not have any reason to anticipate, that his vehicle was afflicted by the Defect when he purchased the vehicle.

58.    Land Rover's omissions were material to Mr. Rains. If Land Rover had adequately disclosed these facts before Mr. Rains purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle had he known the vehicle suffered from the Defect.

59.    On June 21, 2022, as the Rains Vehicle was going though a car wash with Mr. Rains inside the vehicle, the windshield made a loud popping noise and split from the center down, forming a crack about 14 inches long. Ms. Rains did not observe anything impact the windshield as the vehicle was proceeding through a car wash. Below is a photograph of the crack:



60.     On June 22, 2022, Mr. Rains took his vehicle to Land Rover of Scottsdale, an authorized Land Rover dealership located in Phoenix, Arizona, informed the dealership about the circumstances of the windshield crack, that he believes the crack was the result of a defect with the windshield itself, and sought a repair or replacement windshield.  In response, the dealership declined to perform the repair under Land Rover's warranty.

61.     The same day, on June 22, 2022, Mr. Rains called JLRNA customer care line and advised it that his vehicle suffered from the Defect and that he was denied a replacement windshield under Land Rover's warranty. In response, Land Rover also declined to perform the repair under Land Rover's warranty.

62.     On June 28, 2022, Mr. Rains, through his counsel, followed up by a letter to JLRNA advising it that the Rains Vehicle suffered from the Defect and that Mr. Rains was denied a replacement windshield under Land Rover's warranty.

63.     The windshield crack impaired Mr. Rains' visibility out of the vehicle because when he drove his vehicle during certain hours of the day sunlight reflected off the crack and created a significant glare which made it difficult for Mr. Rains to see through his windshield while driving.

64.     Mr. Rains purchased a third-party policy that covers up to $5,000.00 of windshield replacements over the life of the vehicle. Mr. Rains has already used approximately $2,000.00 of that policy. Additionally, Mr. Rains was informed the new windshield calibration costs about $600.00. Further, subsequent to windshield replacement, Mr. Rains paid money to fill in a new windshield chip that was caused as a result of the Defect.

65.     Moreover, concerned how easily the windshield in this vehicle can chip or crack, Mr. Rains avoids driving his vehicle on the highway when possible.

66.     At all times, Mr. Rains has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## II.    David Cerutti

67.     On February 9, 2022, Mr. Cerutti purchased a new 2022 Land Rover Defender, Vehicle Identification Number SALEJ7RX9N2100520 (hereafter the "Cerutti Vehicle") from Land Rover of Englewood (hereafter "Land Rover of Englewood"), an authorized Land Rover dealership located in Englewood, New Jersey.

68.     Mr. Cerutti paid $67,420.00, plus taxes, fees, and other charges, for the Cerutti Vehicle.

69.     Passenger safety and reliability were important factors to Mr. Cerutti's decision to purchase the vehicle. Prior to purchasing the 2022 Land Rover Defender, Mr. Cerutti researched the vehicle by looking at the vehicle's specifications and features on Land Rover's website

17

where the Land Rover Defender was described as durable and tough. Based on Land Rover's representations, Mr. Cerutti was led to believe that the 2022 Land Rover Defender was, among other things, a safe, reliable, and high-quality vehicle, and Land Rover's representations induced him to purchase the vehicle.

70.    Prior to the purchase, Land Rover of Englewood assured Mr. Cerutti that the Cerutti Vehicle was accompanied by Jaguar Land Rover North America, LLC's New Vehicle Limited Warranty.

71.    In its New Vehicle Limited Warranty JLRNA promised to "correct defects in factory-supplied materials or factory workmanship" without charge within 4 years or 50,000 miles in service, whichever occurs first.

72.    Despite Mr. Cerutti's research prior to purchasing the vehicle, neither Land Rover nor the selling dealership ever disclosed at the time of purchase that the 2022 Land Rover Defender contained the Defect. Indeed, Land Rover concealed this information from consumers, and Mr. Cerutti was not aware of, and did not have any reason to anticipate, that his vehicle was afflicted by the Defect when he purchased the vehicle.

73.    Land Rover's omissions were material to Mr. Cerutti. If Land Rover had adequately disclosed these facts before Mr. Cerutti purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle had he known the vehicle suffered from the Defect.

74.    Approximately three and a half months later, on May 22, 2022, Mr. Cerutti experienced the Defect when he went out to his car in the morning and observed that his vehicle's windshield had cracked while the Cerutti Vehicle was stationary. The crack ran from the top center of the windshield and down about 6 inches long and then across to passenger side

18

of the vehicle about 14 inches long. Mr. Cerutti did not observe anything impact his vehicle's windshield prior to the crack forming.

75.    On May 25, 2022, Mr. Cerutti took his vehicle to Land Rover of Englewood, informed the dealership about the circumstances of the windshield crack, that there was no observed impact to the windshield, that he believed the crack was the result of a defect with the windshield itself, and sought a repair or replacement windshield.  In response, Land Rover of Englewood claimed that crack must have formed as a result of a pebble impact, even though there were no signs of any impact on the windshield, and declined to perform the repair under Land Rover's warranty.

76.    The same day, on May 25, 2022, Mr. Cerutti called Land Rover's customer care line and advised it that his vehicle suffered from the Defect and that he was denied a replacement windshield under Land Rover's warranty. In response, Land Rover also declined to perform the repair under Land Rover's warranty.

77.    Land Rover of Englewood quoted Mr. Cerutti about $2,000.00 to replace the windshield in his vehicle.

78.    On June 23, 2022, Mr. Cerutti, through his counsel, followed up by a letter to JLRNA advising it that the Cerutti Vehicle suffered from the Defect and that Mr. Cerutti was denied a replacement windshield under Land Rover's warranty.

79.    Mr. Cerutti felt unsafe driving the vehicle with the crack in the windshield and felt it was crucial to replace the windshield, fearing serious further damage may occur. Mr. Cerutti has since had the windshield replaced at a cost of $1,996.14; Mr. Cerutti paid a $500.00 deductible and the rest of the cost of repair was covered through his automobile insurance policy.

80.     On April 5, 2023, Mr. Cerutti experienced the Defect for the second time. That morning Mr. Cerutti went out to his vehicle and observed a chip in the windshield. Mr. Cerutti did not observe anything impact the windshield prior to the chip appearing.

81.     Again, Mr. Cerutti felt unsafe driving the vehicle with the defective windshield and felt it was crucial to replace the windshield, fearing serious further damage may occur. Mr. Cerutti has since had the windshield replaced again at a cost of $1,047.97; Mr. Cerutti paid another $500.00 deductible and the rest of the cost was covered through his automobile insurance policy.

82.     At all times, Mr. Cerutti has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### III.    Paige Bishop

83.     On January 22, 2021, Ms. Bishop purchased a new 2021 Land Rover Defender, Vehicle Identification Number SALEJ7RX8M2040809 (hereafter the "Bishop Vehicle") from Land Rover of Jacksonville (hereafter "Land Rover of Jacksonville"), an authorized Land Rover dealership located in Jacksonville, Florida.

84.     Passenger safety and reliability were important factors to Ms. Bishop's decision to purchase the vehicle. Prior to purchasing the 2021 Land Rover Defender, Ms. Bishop researched the vehicle by looking at the vehicle's specifications and features on Land Rover's website where the Land Rover Defender was described as durable and tough. Based on Land Rover's representations, Ms. Bishop was led to believe that the 2021 Land Rover Defender was, among other things, a safe, reliable, and high-quality vehicle, and Land Rover's representations induced her to purchase the vehicle.

85.     Prior to the purchase, Land Rover of Jacksonville assured Ms. Bishop that the Bishop Vehicle was accompanied by Jaguar Land Rover North America, LLC's New Vehicle Limited Warranty.

86.     In its New Vehicle Limited Warranty JLRNA promised to "correct defects in factory-supplied materials or factory workmanship" without charge within 4 years or 50,000 miles in service, whichever occurs first.

87.     Despite Ms. Bishop's research prior to purchasing the vehicle, neither Land Rover nor the selling dealership ever disclosed at the time of purchase that the 2021 Land Rover Defender contained the Defect. Indeed, Land Rover concealed this information from consumers, and Ms. Bishop was not aware of, and did not have any reason to anticipate, that his vehicle was afflicted by the Defect when he purchased the vehicle.

88.     Land Rover's omissions were material to Ms. Bishop. If Land Rover had adequately disclosed these facts before Ms. Bishop purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle had she known the vehicle suffered from the Defect.

89.     Approximately four months after purchase, on or about May 26, 2021, Ms. Bishop experienced the Defect as she was driving down the interstate highway. A small pebble bounced off the road and hit the windshield, causing a crack to spread across the windshield. The windshield crack grew to the width of two feet, was directly in the driver's line of vision, and was a distraction to Ms. Bishop when driving.

90.     Thereafter, Ms. Bishop filed a claim with her automobile insurance carrier and waited for a windshield replacement for three months due to shortage of replacement factory windshields.

91.     During the three months wait Ms. Bishop had no choice but to drive her vehicle with the cracked windshield, which caused her to feel nervous and unsafe out of fear that the windshield crack might continue to grow, or the windshield might collapse.

92.     Shortly after getting her vehicle's windshield replaced in late August 2021, Ms. Bishop took her vehicle to Land Rover of Jacksonville, informed the dealership about the circumstances of the windshield crack, and sought calibration of the windshield.

93.     Then, in September 2021, as Ms. Bishop was driving on the highway, she heard a popping sound followed by a crack spreading across the replacement windshield. Ms. Bishop did not see anything impact the windshield.

94.     Ms. Bishop immediately filed a claim with her automobile insurance carrier and again waited for a replacement windshield for six months.

95.     During the six months period that Ms. Bishop was awaiting yet another replacement windshield, she was forced to drive her vehicle with yet another cracked windshield, and multiple other chips formed, again impairing her vision and causing her to feel unsafe when driving her vehicle.

96.     Six months later, shortly after getting her vehicle's second windshield replaced in late February 2022, Ms. Bishop took her vehicle to Land Rover of Jacksonville, informed the dealership about the circumstances of the windshield crack, and sought calibration of the windshield. Ms. Bishop thought it was unusual for the windshield to crack and chip so easily in her vehicle as she had previously owned other vehicles that experienced windshield impacts from small pebbles, but such impacts did not chip or crack the windshields in those other vehicles.

97.    At this time, the dealership informed Ms. Bishop the repair would not be covered under warranty and there was no recall or a warranty repair available for the Defect too.

98.    The same week when the windshield was replaced in Ms. Bishop's vehicle for the second time, a crack formed again in the second replacement windshield due to the Defect. Again, Ms. Bishop did not see anything impact the windshield.

99.    On April 20, 2022, Ms. Bishop, through her counsel, sent a letter to JLRNA advising it that the Bishop Vehicle suffered from the Defect and that Ms. Bishop was told by the dealership its repair would not be covered under Land Rover's warranty.

100.   On May 16, 2022, Land Rover responded with a refusal to cover windshield repair in Ms. Bishop's vehicle under its warranty.

101.   At all times, Ms. Bishop has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## IV.    Carlos Guidorizzi

102.   In May 2021, Mr. Guidorizzi purchased a new 2021 Land Rover Defender, Vehicle Identification Number SALEJ7RX6M2055776 (hereafter the "Guidorizzi Vehicle") from Land Rover Van Nuys (hereafter "Land Rover Van Nuys"), an authorized Land Rover dealership located in Van Nuys, California.

103.   Passenger safety and reliability were important factors to Mr. Guidorizzi's decision to purchase the vehicle. Prior to purchasing the 2021 Land Rover Defender, Mr. Guidorizzi researched the vehicle by looking at the vehicle's specifications and features on Land Rover's website where the Land Rover Defender was described as durable and tough, as well as by reviewing the electronic brochure for the 2021 Land Rover Defender on Land Rover's website. Based on Land Rover's representations, Mr. Guidorizzi was led to believe that the 2021

Land Rover Defender was, among other things, a safe, reliable, and high-quality vehicle, and Land Rover's representations induced him to purchase the vehicle.

104.    Prior to the purchase, Land Rover Van Nuys assured Mr. Guidorizzi that the Guidorizzi Vehicle was accompanied by Jaguar Land Rover North America, LLC's New Vehicle Limited Warranty.

105.    In its New Vehicle Limited Warranty JLRNA promised to "correct defects in factory-supplied materials or factory workmanship" without charge within 4 years or 50,000 miles in service, whichever occurs first.

106.    Despite Mr. Guidorizzi's research prior to purchasing the vehicle, neither Land Rover nor the selling dealership ever disclosed at the time of purchase that the 2021 Land Rover Defender contained the Defect. Indeed, Land Rover concealed this information from consumers, and Mr. Guidorizzi was not aware of, and did not have any reason to anticipate, that his vehicle was afflicted by the Defect when he purchased the vehicle.

107.    Land Rover's omissions were material to Mr. Guidorizzi. If Land Rover had adequately disclosed these facts before Mr. Guidorizzi purchased the vehicle, he would have learned of the concealed information and would have paid less for it had he known the vehicle suffered from the Defect.

108.    In July 2021, Mr. Guidorizzi experienced the Defect while he was driving when a very small pebble hit the windshield causing it to chip, and a crack formed instantly from the chip. The crack grew larger over time. Mr. Guidorizzi was surprised that such a small pebble caused such a large crack as he had owned other vehicles that had suffered a small pebble impact that sometimes caused the windshield to chip, but never to crack.

109.    Shortly thereafter, Mr. Guidorizzi took his vehicle to Land Rover Mission Viejo, Land Rover's authorized dealership in Mission Viejo, California (hereinafter "Land Rover Mission Viejo"), informed the dealership about the circumstances of the windshield crack and sought a repair or replacement windshield under Land Rover's warranty. In response, Land Rover Mission Viejo declined to repair or replace the windshield under the Land Rover's warranty.

110.    Mr. Guidorizzi then called Land Rover customer care line and informed it of the circumstances of the crack, but Land Rover too told Mr. Guidorizzi that Land Rover would not repair or replace the windshield under its warranty.

111.    Due to a replacement windshields shortage, Mr. Guidorizzi was required to wait three months for a replacement windshield, leaving him with no choice but to drive with a cracked windshield.

112.    Land Rover Mission Viejo then replaced the windshield in Mr. Guidorizzi's vehicle in September 2021 and charged him approximately $1,800.

113.    Then, in October 2022, the Guidorizzi Vehicle suffered a Defect the second time when it suddenly cracked as Mr. Guidorizzi was driving, and where Mr. Guidorizzi did not observe anything hitting the windshield.

114.    On November 18, 2022, Mr. Guidorizzi, through his counsel, sent a letter to JLRNA advising it that the Guidorizzi Vehicle suffered from the Defect and that Mr. Guidorizzi was denied a replacement windshield under Land Rover's warranty.

115.    At all times, Mr. Guidorizzi has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## V.    Heather Richards

116.    On March 12, 2021, Ms. Richards purchased a new 2020 Land Rover Defender, Vehicle Identification Number SALEJ7EX9L2032996 (hereafter the "Richards Vehicle") from Land Rover Colorado Springs, Inc. (hereafter "Land Rover of Colorado Springs"), an authorized Land Rover dealership located in Colorado Springs, Colorado.

117.    Passenger safety and reliability were important factors to Ms. Richards's decision to purchase the vehicle. Prior to purchasing the 2020 Land Rover Defender, Ms. Richards researched the vehicle by looking at the vehicle's specifications and features on Land Rover's website where the Land Rover Defender was described as durable and tough. In addition, prior to purchasing the 2020 Land Rover Defender Ms. Richards reviewed the 2020 Land Rover vehicle brochures and visited Land Rover of Colorado Springs where she read Land Rover's sticker affixed to that vehicle's window. Based on Land Rover's representations, Ms. Richards was led to believe that the 2020 Land Rover Defender was, among other things, a safe, reliable, and high-quality vehicle, and Land Rover's representations induced her to purchase the vehicle.

118.    Prior to the purchase, Land Rover of Colorado Springs assured Ms. Richards that the Richards Vehicle was accompanied by Jaguar Land Rover North America, LLC's New Vehicle Limited Warranty.

119.    In its New Vehicle Limited Warranty JLRNA promised to "correct defects in factory-supplied materials or factory workmanship" without charge within 4 years or 50,000 miles in service, whichever occurs first.

120.    Despite Ms. Richards's research prior to purchasing the vehicle, neither Land Rover nor the selling dealership ever disclosed at the time of purchase that the 2020 Land Rover Defender contained the Defect. Indeed, Land Rover concealed this information from consumers,

and Ms. Richards was not aware of, and did not have any reason to anticipate, that his vehicle was afflicted by the Defect when he purchased the vehicle.

121.    Land Rover's omissions were material to Ms. Richards. If Land Rover had adequately disclosed these facts before Ms. Richards purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it had he known the vehicle suffered from the Defect.

122.    In approximately December of 2021, Ms. Richards experienced the Defect when she was driving and heard something hit the windshield followed by a crack spreading across the windshield.

123.    Ms. Richards the filed a claim with her insurance and paid a $250 deductible to replace the windshield.

124.    On September 16, 2022, Ms. Richards experienced the Defect again. As she was driving, Ms. Richards noticed a small object hit the replacement windshield followed by a crack spreading across the windshield. Ms. Richards later looked but could not locate an impact point on the windshield.

125.    Shortly thereafter, Ms. Richards contacted Land Rover of Colorado Springs and informed the dealership about the circumstances of the windshield crack as she believed there was a defect with the windshield because a small impact should not have caused the windshield to crack. Ms. Richards had previously owned other vehicles that experienced windshield impacts from small pebbles, but such impacts did not chip or crack the windshields in those other vehicles.

126.    In response, Land Rover of Colorado Springs informed Ms. Richards that the Defect was not covered under the Land Rover's warranty.

127.    On October 7, 2022, Ms. Richards, through her counsel, sent a letter to JLRNA advising it that the Richards Vehicle suffered from the Defect and that Ms. Richards was denied a replacement windshield under Land Rover's warranty.

128.    On November 11, 2022, Land Rover responded with a refusal to cover windshield repair in Ms. Richards' vehicle under its warranty.

129.    Currently, the windshield remains cracked, unrepaired, and on a backorder. Ms. Richards is left with no choice but to drive her vehicle with the cracked windshield, with the crack impairing the visibility out of the vehicle. The crack extends right across the driver's side of the windshield, and across the line Ms. Richards' sight. At times, the sunlight reflects off the windshield's crack and creates a significant and strong glare across the windshield.

130.    At all times, Ms. Richards has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**VI.    Brian Gresh**

131.    On October 31, 2020, Mr. Gresh purchased a new 2020 Land Rover Defender, Vehicle Identification Number SALEP7EU0L2019607 (hereafter the "Gresh Vehicle") from Holmes European Motors (hereafter "Holmes European Motors"), an authorized Land Rover dealership located in Shreveport, Louisiana.

132.    Passenger safety and reliability were important factors to Mr. Gresh's decision to purchase the vehicle. Prior to purchasing the 2020 Land Rover Defender, Mr. Gresh researched the vehicle by looking at the vehicle's specifications and features on Land Rover's website where 2020 Land Rover was depicted as a durable and rugged off-road vehicle. In addition, prior to purchasing the 2020 Land Rover Defender Mr. Gresh reviewed the 2020 Land Rover Defender manufacturer's brochures that listed such vehicle's specifications and features. Based

on Land Rover's representations, Mr. Gresh was led to believe that the 2020 Land Rover Defender was, among other things, a safe, reliable, and high-quality vehicle, and Land Rover's representations induced him to purchase the vehicle.

133.    Prior to the purchase, Holmes European Motors assured Mr. Gresh that the Gresh Vehicle was accompanied by Jaguar Land Rover North America, LLC's New Vehicle Limited Warranty.

134.    In its New Vehicle Limited Warranty JLRNA promised to "correct defects in factory-supplied materials or factory workmanship" without charge within 4 years or 50,000 miles in service, whichever occurs first.

135.    Despite Mr. Gresh's research prior to purchasing the vehicle, neither Land Rover nor the selling dealership ever disclosed at the time of purchase that the 2020 Land Rover Defender contained the Defect. Indeed, Land Rover concealed this information from consumers, and Mr. Gresh was not aware of, and did not have any reason to anticipate, that his vehicle was afflicted by the Defect when he purchased the vehicle.

136.    Land Rover's omissions were material to Mr. Gresh. If Land Rover had adequately disclosed these facts before Mr. Gresh purchased the vehicle, he would have learned of the concealed information and would have paid less for it had he known the vehicle suffered from the Defect.

137.    Approximately two to three weeks after taking delivery of his vehicle, Mr. Gresh experienced the Defect in his car while he was driving on the highway when the windshield suddenly cracked. Mr. Gresh did not observe anything impact the windshield prior to the crack forming.

138.    Shortly thereafter, Mr. Gresh took his vehicle to Holmes European Motors, informed the dealership about the circumstances of the windshield crack, and sought a repair.

139.    However, due to unavailability of replacement windshields, Mr. Gresh was not able to have the windshield replaced until a month after it cracked. While driving with the crack, Mr. Gresh felt unsafe, worried that the windshield would collapse. Additionally, the crack impaired Mr. Gresh's vision while driving as the crack reflected the sun light into Mr. Gresh's line of sight.

140.    Once a replacement windshield became available, Holmes European Motors replaced the windshield in the Gresh Vehicle and charged Mr. Gresh automobile insurance carrier and Mr. Gresh for the repair. However, Holmes European Motors did not perform the windshield replacement under the Land Rover's New Vehicle Limited Warranty.

141.    On June 29, 2022, Mr. Gresh, through his counsel, sent a letter to JLRNA advising it that the Gresh Vehicle suffered from the Defect and that Land Rover dealership failed to replace the windshield under Land Rover's warranty.

142.    On July 11, 2022, Land Rover responded with a refusal to cover windshield repair in Mr. Gresh's vehicle under its warranty.

143.    At all times, Mr. Gresh has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL PLAINTIFFS AND THE CLASSES

### I.    The Defect

144.    After discontinuing its Defender line of Land Rover vehicles in the U.S. market in 1997, Land Rover re-released a fully re-designed Defender in June 2020 with its 2020 Defender model.

145.    Since then, Defendants have sold over thirty thousand 2020-2022 Defender Class Vehicles across the United States.

146.    Defendants have affirmatively represented that their Defender Class Vehicles are durable and tough. For example, on the JLRNA website – which JLR LTD owns and controls – Land Rover stated "[t]he new model represents 70 years of innovation and improvement, honoring the vehicle's history for rugged solidity while thoroughly remaining a Defender for the 21st century."[12]  In addition, on its website Land Rover touted the Defender's durability: "Featuring our toughest materials yet and tested to its very limits. The Defender has been designed for optimum durability."[13] Elsewhere on its website, Land Rover states the Defender is "made for impact," claiming the Class Vehicles' "Unique unibody architecture contributes to the Defender being one of the toughest and strongest vehicles we have ever created."[14]

147.    The Class Vehicles suffer from the Defect.  Specifically, as a result of the way the vehicles are manufactured and/or made and the use of deficient materials, the Class Vehicles' front windshields are not sufficiently strong and durable for normal driving conditions and their intended use, and the windshields crack, chip and/or fracture for no reason at all and/or under circumstances that would not cause non-defective windshields to similarly fail such as impact from a small pebble.  Accordingly, when Class Vehicle windshields crack and fail following a minor impact from a small pebble, the windshields do not fail because of the pebble but due to the defective nature of the windshields which are not strong or durable enough to handle normal driving conditions.

---

[12] https://web.archive.org/web/20200417210155/https://www.landroverusa.com/vehicles/defender/index.html (last visited Oct. 23, 2023).
[13]  https://web.archive.org/web/20200923070334/https://www.landroverusa.com/vehicles/defender/index.html (last visited Oct. 23, 2023).
[14] https://web.archive.org/web/20200417210155/https://www.landroverusa.com/vehicles/defender/index.html (last visited Oct. 23, 2023).

148.    Though Defendants discovered the Defect through extensive pre and post-sale testing on the Class Vehicle windshields, they have not issued a recall regarding the windshields or otherwise provide any proposed repair attempts to Land Rover dealerships or to Plaintiffs or other Class Vehicle owners.

149.    Instead, warranty repairs for windshields have been denied to Plaintiffs and other class members even though those repairs are necessary due to the Defect.

150.    The Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous to consumers due to, *inter alia*, the impact of the Defect on visibility as well as the Class Vehicles' structural integrity, and the potential for injury.

151.    Class Vehicle owners report that where there has been no impact damage or a slight impact from a small pebble, or their vehicles sat stationary, their Class Vehicles windshields cracked, including replacement windshields previously replaced due to Defect:

- NHTSA Complaint No. 11433619, September 20, 2021 (Incident Date September 19, 2021): Problem statement: Windshield Issue: The windshield developed a sudden crack while the vehicle was stationary, with no external impact or action Conditions: stationary, outside temp: 97 deg Impacting: visibility and safety features such as cameras, sensor, and lane departure assist

- NHTSA Complaint No. 11435211, October 2, 2021 (Incident Date August 7, 2021): Driving along the road with no cars around, the windshield made a loud noise and a crack was formed coming from the passenger side A-pillar. The crack of course grew over time. No rock chip. Clearly a defective windshield. The dealer would not replace it under warranty even though it clearly started where a rock could not have chipped it.

- NHTSA Complaint No. 11439152, November 3, 2021 (Incident Date May 29, 2021): 2 cracked windshields, car has only 15K miles- TONS of Defender owners on FB groups and forums same- some one 4th and 5th windshields- current wait to new ones from UK is 2-4 months. Land Rover knows these are defective and won'y admit/recall, just passing this off to customer. A new windshield is $1800 a pop- people getting hit paying high deductible, getting pulled over, poor visibility, some have cracks so large that they can not operate their vehicle. Currently, I am

in wait, no ETA for my 3rd new windshield- I have a large crack and 2 small chips from all separate incidents. Huge safety issue, bc cracks interfere with driver assist Dates of Cracks: Car has only 15K miles 1. May 29, 2021 2. August 18, 2021 People on New Defenders Group on Facebook have started survey for owners with the problem - and forums have tons of issues. Imagine all the owners who have only had one crack and just think it's bad luck and don't realize there's an issue?

- NHTSA Complaint No. 11453301, February 21, 2022 (Incident Date February 17, 2022): Easily cracked windshield. Less than 30 days owned and a small pebble cracked my windshield.

- NHTSA Complaint No. 11464909, May 16, 2022 (Incident Date May 14, 2022): For the SECOND time, my windshield cracked in the upper right corner with no impact. The second time, I wasn't even driving! The crack looks nearly identical, even as it runs. I paid for a new windshield the first time because they insisted that a rock hit me, although none of the people in the car ever heard or saw that. This time, I wasn't even driving.

- NHTSA Complaint No. 11470701, June 23, 2022 (Incident Date June 3, 2022): Windshield cracked for no reason. ie no chip caused by rock, etc. Happened while I was driving with no traffic.

152.    Further,  Land Rover refuses to repair or repair or replace the Defect under JLRNA's written warranty when given a reasonable opportunity to do so.   Land Rover UK has not issued any bulletins or instructions to Land Rover dealerships regarding the Class Vehicle's windshields' propensity to crack and chip or repairing the same, nor has Land Rover authorized its dealerships to cover Class Vehicle windshield repair or replacement costs under Land Rover's warranty.  In addition, Land Rover UK has refused to permit the repair or replacement of the Plaintiffs' windshields under JLRNA's warranty.  Likewise, as detailed in the NHTSA and online complaints reproduced below, other Class Vehicle owners complain that Land Rover dealers charge them out-of-pocket for repairs.

153.    Not only does Land Rover refuse to repair the Defect under JLRNA's warranty, but because of how widespread the issue is, Land Rover UK often takes months to provide Class

Vehicle owners with replacement windshields.  For instance, as set forth above Plaintiffs regularly had to wait months for replacement windshields.  Likewise, Class Vehicle owners have complained to NHTSA of windshield wait times reaching "2-4 months":

- NHTSA Complaint No. 11439152, November 3, 2021 (Incident Date May 29, 2021): 2 cracked windshields, car has only 15K miles- TONS of Defender owners on FB groups and forums same- some one 4th and 5th windshields- current wait to new ones from UK is 2-4 months. […]

154.    Moreover, on information and belief, when windshield repairs are performed by Defendants' dealers (for charge), defective windshields are merely replaced with similarly defective windshields.  Thus, Plaintiffs and Class Vehicle owners have required multiple replacement windshields:

- NHTSA Complaint No. 11439152, November 3, 2021 (Incident Date May 29, 2021): 2 cracked windshields, car has only 15K miles- TONS of Defender owners on FB groups and forums same- some one 4th and 5th windshields- current wait to new ones from UK is 2-4 months. Land Rover knows these are defective and won'y admit/recall, just passing this off to customer. A new windshield is $1800 a pop- people getting hit paying high deductible, getting pulled over, poor visibility, some have cracks so large that they can not operate their vehicle. Currently, I am in wait, no ETA for my 3rd new windshield- […]

155.    Land Rover UK had and has a duty to fully disclose the true nature of the Defect and the associated repair costs to Class Vehicle owners, among other reasons, because the Defect poses an unreasonable safety hazard; because Land Rover UK had and has exclusive knowledge or access to material facts about the Class Vehicles' front windshield that were and are not known to or reasonably discoverable by Plaintiffs and the other Class Members; and because Land Rover UK has actively concealed the Defect from its customers.  Because the windshield contained in each Class Vehicle is defective, each Class Vehicle windshield should be replaced by Land Rover UK free of charge regardless of whether the windshield has failed, or the facts and circumstances surrounding any failure.

II.    **Land Rover UK's Knowledge of the Defect**

156.    Before Land Rover UK sold Plaintiffs their Class Vehicles, it was on notice that the Class Vehicles suffered from the Defect, however Land Rover UK failed to disclose the existence of the defect to Plaintiffs or any other Class Vehicle owner.

157.    Land Rover UK became aware of the Defect through sources not available to Plaintiffs and Class Members, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Land Rover's network of dealers and directly to Land Rover UK, analysis of early aggregate warranty data compiled from Land Rover's network of dealers, testing conducted by Land Rover in response to consumer complaints, and repair order and parts data received by Land Rover UK from Land Rover's network of dealers.

158.    On information and belief, during the pre-release process of designing, manufacturing, engineering, and performing durability testing on the Class Vehicles, which would have likely occurred between 2019 and early 2020 before Land Rover UK began selling the Class Vehicles in June 2020, Land Rover UK necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicles' windshields: the types and properties of materials used to make them, including their durability and whether those materials would weaken over time regardless of wear and use; the basic engineering principles behind their construction; the forces and stresses the windshields would face; when and how the windshields would fail; and the cumulative and specific impacts on the windshields caused by wear and use, the passage of time, and environmental factors.

159.    An adequate pre-release analysis of the design, engineering, and manufacture of the windshields used for the Class Vehicles would have revealed to Land Rover that as a result of the manner in which the windshields were made and assembled and the materials used, the windshields were insufficiently strong and durable for their intended use. Thus, during the pre-release analysis stage of the Class Vehicles, Land Rover UK would have known that the windshield installed in Class Vehicles was defective, would crack spontaneously or as a result of minor impacts that should not have resulted in windshield cracks (such as impact from a small pebble), and would pose a safety risk to owners/lessees and the motoring public. Despite that such testing on the Class Vehicles revealed the Defect to Land Rover UK, Land Rover UK failed to remedy the manufacturing processes with the Class Vehicles before putting the vehicles into production and selling them to the public.

160.    Upon information and belief, Land Rover UK also knew about the Defect because of the higher-than-expected number of replacement windshields ordered from Land Rover UK, which should have alerted Land Rover UK that this was a defective part. Land Rover service centers use Land Rover UK replacement parts that they order directly from Land Rover, and Land Rover UK and JLRNA maintain detailed records of the number of OEM windshield parts sold. This includes the number of OEM windshield parts that are sold to Land Rover dealerships as well as third party repair facilities. Moreover, as set forth in the consumer complaints below, shortly after Land Rover UK began selling the Class Vehicle, Class Vehicle windshields were on backorder due to the higher-than-expected number of replacement windshields ordered by Land Rover dealerships. Therefore, Land Rover UK would have detailed and accurate data regarding the number and frequency of replacement part orders, including replacement windshields. The ongoing sales of replacement windshields and the fact that windshields were being ordered at

such high rates (and at rates higher than windshields for other Land Rover vehicles) that the parts were on backorder, was known to Land Rover UK and would have alerted Land Rover UK that its windshields were defective, failed and cracked significantly more often than non-defective windshields, and posed a safety risk early on.

161.    Land Rover UK also knew about the Defect because numerous consumer complaints regarding windshield failure were made directly to Land Rover, JLRNA and Land Rover dealerships. The large number of complaints, and the consistency of their descriptions of windshield failure alerted Land Rover UK to this serious Defect affecting the Class Vehicles. The full universe of complaints made directly to Land Rover UK about the Defect is information presently in the exclusive custody and control of Land Rover UK and is not yet available to Plaintiffs.  However, many Class Vehicle owners, including the Plaintiffs, complained directly to JLRNA and Land Rover dealerships and service centers about the repeated windshield failures their Vehicles experienced.  Complaints made to JLRNA were communicated to and are in the possession of Land Rover UK, who reviewed and analyzed such complaints.

162.    Because the Defect can and does manifest almost immediately – often within weeks of the Class Vehicles first being driven – Land Rover UK, began receiving notification of the higher-than-expected number of replacement windshields ordered from Land Rover and consumer complaints regarding windshield failure within weeks after Land Rover began selling the Class Vehicles in June 2020.

163.    JLRNA and Land Rover UK have exchanged information about customer complaints regarding the Class Vehicle windshields, warranty claims, windshield part sales data and demand for windshields, including as part of Land Rover UK's policy that subsidiaries like JLRNA report risks and issues to Land Rover UK.

164.    Plaintiffs have sued JLRNA regarding the Defect. *See Jaguar Land Rover North America, LLC*, No: 2:22-cv-04370-EP-JSA (D.N.J.).   JLRNA, in turn, has informed Land Rover UK about that lawsuit and that Plaintiff may bring the same claims arising out of the Defect against Land Rover UK.

### III.    The NHTSA Complaints and Online Discussions of the Defect

165.    Upon information and belief, thousands of purchasers and lessees of the Class Vehicles have experienced the Defect.  Given how widespread the issue is and the fact that windshields often crack within weeks of their sale, Class Vehicle owners have been complaining about the Defect directly to Land Rover since 2020 and have been posting such complaints online since at least early 2021.

166.    Automobile manufacturer and distributors maintain presence and regularly monitor social media for vehicle owners concerns and, upon information and belief, Land Rover maintains presence on and regularly monitors social media for such content too, has done so since it began selling the Class Vehicles, and published social media user guidelines on its website.[15]

167.    For instance on www.LandRoverForums.com, a Land Rover vehicle enthusiast website that upon information and belief Land Rover regularly monitors, a January 15, 2021 post written by a Class Vehicle owner noted that they "have a 20 defender P400- the windshield cracked mid Dec, and [they] had a new one on order since then."[16] Other Class Vehicle owners responded that they had near-identical experiences; one owner complained that their "windshield cracked for no reason" and another similarly complained, "My 110 with 7500 miles just cracked last week. No impact, no crazy stuff like putting cold water on hot glass. Mine started right at the

---

[15] https://www.landroverusa.com/social-media.html (last visited Jun. 29, 2022).
[16] https://landroverforums.com/forum/2020-defender-60/front-windshield-104029/ (last visited Jun. 27, 2022).

top center, went straight down about 6 inches and then took a sharp bend to the passenger side and is running horizontal now."[17]  Other Class Vehicle owners likewise complained: "Cracked this morning on the drive into work...started driver's side at the bottom. No rock, no damage other than the crack."[18] And other Class Vehicle owners complained on about having multiple cracks.

168.    Similarly, on Facebook, Class Vehicle owners have been complaining about the Defect, including in the "The New Defender Owners Group" Facebook Group, since Land Rover began selling the vehicles.  For instance, on October 8, 2021, one Class Vehicle owner published a post stating, "Got my first windshield crack today. Was surprised to learn that the dealership doesn't service its own vehicles' windshields. I called the company they use and was told 4 - 6 weeks for a replacement and to continue driving with no worries about safety. They assured me the windshield will not shatter or cause any further problems in the meantime. Does anyone have firsthand experience with this issue?"[19]  In response, other Class Vehicle owners commented that they too had already experienced the Defect.

169.    Likewise, on Facebook in the New Defender Owners Group, Class Vehicle owners conducted polls to gather information about Defender vehicles that experienced the Defect, with one such poll identifying 268 Class Vehicle owners that experienced the Defect[20] and another poll identifying 47 owners.[21]

170.    Class Vehicle owners have continued to post similar such Facebook posts and comments about the Defect to date. For instance, on June 25, 2022, one owner posted in the

---

[17] https://landroverforums.com/forum/2020-defender-60/cracked-windshield-107552/ (last visited Jun. 27, 2022).

[18] https://landroverforums.com/forum/2020-defender-60/cracked-windshield-110590/ (last visited Jun. 27, 2022).

[19] https://www.facebook.com/groups/686273281850563/permalink/1229541830857036/ (last visited Jun. 27, 2022).

[20] https://www.facebook.com/groups/686273281850563/permalink/1244027399408479/ (last visited Jun. 27, 2022).

[21] https://www.facebook.com/groups/686273281850563/permalink/1252213525256533/ (last visited Jun. 27, 2022).

same the New Defender Owners Group "My 4th crack happened at 19k miles. This has to stop."[22]

171.    Moreover, Land Rover monitors customers' complaints made to the National Highway Traffic Safety Administration ("NHTSA"). Federal law requires automakers like JLRNA and Land Rover UK to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

172.    Automakers also have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Reporting Requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id*. Thus, Land Rover knew or should have known of the many complaints about the Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Land Rover to the Defect.

173.    Upon information and belief, given the risks associated with the high number of NHTSA complaints concerning the Class Vehicle windshields, JLRNA has notified Land Rover UK about the number and content of the NHTSA complaints.

174.    Indeed, complaints concerning the Defect are one of the most common complaint topic amongst NHTSA complaints regarding the Class Vehicles.  The below example complaints

---

[22] https://www.facebook.com/groups/686273281850563/permalink/1400654720412412/ / (last visited Jun. 27, 2022).

concerning 2020-2022 Land Rover Defender vehicles, filed by consumers with the NHTSA and posted on the Internet, which on information and belief Land Rover actively monitored during the relevant time period, demonstrate that the Defect is widespread and dangerous, and that Land Rover has known about the defect at all relevant times:

*2020 Defender NHTSA Complaints*:

- NHTSA Complaint No. 11433648, September 20, 2021 (Incident Date August 18, 2021): My windshield cracked with no apparent strike with under 5K miles on the vehicle. Researching this, LOTS of people experience broken windshields on Defenders and Land Rover products. There are lots of discussion in online owners' forums about the frequency of this and some notion that JLR uses glass that is thinner than other manufacturers.

- NHTSA Complaint No. 11434894, September 29, 2021 (Incident Date September 20, 2021): My front windshield cracked to the point of requiring replacement with neither notice nor reasonable cause (no impact, no crack starting point, besides the bottom edge, no temperature gradients, no pressure applied to the windshield).

- NHTSA Complaint No. 11435211, October 2, 2021 (Incident Date August 7, 2021): Driving along the road with no cars around, the windshield made a loud noise and a crack was formed coming from the passenger side A-pillar. The crack of course grew over time. No rock chip. Clearly a defective windshield. The dealer would not replace it under warranty even though it clearly started where a rock could not have chipped it.

- NHTSA Complaint No. 11491779, November 1, 2022 (Incident Date October 14, 2022): My 2020 Defender has had three incidences of the windshield cracking due to the smallest pebble. The first two cracks, I had professionally sealed. The latest incident involved a pebble so small that I couldn't see it. In fact, the pebble was so tiny that a point of contact on the windshield can barely be observed. However, it caused the windshield to crack clear across the middle, impairing visibility and creating an unsafe driving experience. This is, I believe, the seventh Land Rover windshield that I have had the misfortune to have crack on me over the years. One Range Rover windshield cracked while sitting in the driveway with no projectiles involved. Another cracked in cooler overnight weather. These windshields are clearly defective and Land Rover is aware of the problem. This is why the dealership offers a very pricey windshield package as an option when you purchase the vehicle. I have called Land Rover corporate again in this instance because I'm fed up with paying $1800 to repair a defective bit of glass, only to have another crack appear and be forced to repair or replace that as well. Land Rover Corporate said that a pebble constituted "outside damage" and the windshield would not be covered under warranty. However, a driver does purchase a car under the presumption that the glass would be safe if struck by a

tiny object or if taken through a car wash--as occurred with my previous Range Rover. Taken together, I do request that this consumer safety board review this issue as I know for a fact that I am not the only one concerned about the safety and reliability of the Land Rover windshields.

### *2021 Defender NHTSA Complaints:*

- NHTSA Complaint No. 11433619, September 20, 2021 (Incident Date September 19, 2021): Problem statement: Windshield Issue: The windshield developed a sudden crack while the vehicle was stationary, with no external impact or action Conditions: stationary, outside temp: 97 deg Impacting: visibility and safety features such as cameras, sensor, and lane departure assist

- NHTSA Complaint No. 11438618, October 29, 2021 (Incident Date August 2, 2021): The contact owns a 2021 Land Rover Defender. The contact stated that the windshield cracked without impact, causing electrical issues. The vehicle was taken to a local dealer where it was diagnosed but not repaired. The manufacturer was informed of the failure and told the contact that they were unable to assist. The failure mileage was approximately 1,500.

- NHTSA Complaint No. 11439215, November 3, 2021 (Incident Date September 21, 2021): My windshield broke in only owning this car 30 days I hear from other people that this is there 3 time replacement. I think this is a design issues and should be looked into.

- NHTSA Complaint No. 11439152, November 3, 2021 (Incident Date May 29, 2021): 2 cracked windshields, car has only 15K miles- TONS of Defender owners on FB groups and forums same- some one 4th and 5th windshields- current wait to new ones from UK is 2-4 months. Land Rover knows these are defective and won't admit/recall, just passing this off to customer. A new windshield is $1800 a pop- people getting hit paying high deductible, getting pulled over, poor visibility, some have cracks so large that they can not operate their vehicle. Currently, I am in wait, no ETA for my 3rd new windshield- I have a large crack and 2 small chips from all separate incidents. Huge safety issue, bc cracks interfere with driver assist Dates of Cracks: Car has only 15K miles 1. May 29, 2021 2. August 18, 2021 People on New Defenders Group on Facebook have started survey for owners with the problem - and forums have tons of issues. Imagine all the owners who have only had one crack and just think it's bad luck and don't realize there's an issue?

- NHTSA Complaint No. 11443713, December 13, 2021 (Incident Date December 12, 2021): My windshield spontaneously cracked. No impact, just a sudden cracking noise and the crack appeared shortly thereafter. I was in the car at the time. No impact with anything was noted. (I have had chips many times and this was not that sound). The crack starts at the lower midline of the windshield, extends up about 9" before arcing horizontally. This crack is near identical to at least three other owners of the same car. All had their windshield spontaneously crack in the same manner i describe. No impact noted. The pattern of crack and location is always lower border to the midline of the

windshield. One fellow owner is a friend who joked about when I'd have to replace my windshield in my brand new Defender. He experienced the same thing. I believe it may relate to use of the defogger. Heat in the car with colder temps outside. I'm in WA so no extreme temps here. was about 35F outside when the defogger was used. That is the only thing I can think of. Pictures can be provided upon request. The cracks are too similar in location and dimension and too spontaneous (no strike noted) to be anything other that an integral design flaw. Part: Windshield Safety issue: Windshield integrity contributes to the strength of the vehicle in a rollover/accident so I believe this flaw has a direct safety impact for owners of the new Land Rover Defender. Dealer: As this is glass, dealer will not entertain warranty issues but it appears to be just that. I won't waste time contacting dealership. Others have on this matter. No point. No warning signs It has not been inspected by anyone

- NHTSA Complaint No. 11451131, February 9, 2022 (Incident Date November 8, 2021): Component: windshield Issue: under adverse temperature conditions ( e.g. high temp or low temp ) the windshield can develop a sudden crack, without any external impact. Conditions: above 95 deg F or below 30 deg F ; Status: vehicle could be stationary, or in motion; Hazard to occupants: Yes; Safety concern: yes, if the vehicle is in motion the size of the crack can develop very fast and create a catastrophic failure which may impact the occupants. JLR - fails even to acknowledge any issues and denies any design fault or responsibility.

- NHTSA Complaint No. 11451600, February 11, 2022 (Incident Date March 5, 2022): Windshield spontaneously cracked while parked (no impact). Crack was near top center and runs across the safety camera system. Crack was also instantaneously 1.5 foot long and partially obstructs driver's view. Scheduled for inspection by dealership - police, insurance has not been involved. No warning lamps or messages have appeared before or after the crack formed.

- NHTSA Complaint No. 11453301, February 21, 2022 (Incident Date February 17, 2022): Easily cracked windshield. Less than 30 days owned and a small pebble cracked my windshield.

- NHTSA Complaint No. 11455637, March 7, 2022 (Incident Date February 10, 2022): 12 inch crack developed overnight. No signs of rock hit or any other impact.

- NHTSA Complaint No. 11457497, March 20, 2022 (Incident Date April 1, 2021): Shortly after buying the car a small people hit the windshield while driving on the highway and broke the windshield right in the eyesight of the driver side. It was a little larger than a quarter in size and took 3 months for replacement due to back order. 2 weeks after the replacement the windshield spontaneously cracked while driving from the middle base of the windshield up and towards the passenger side about 20 inches long. Nothing hit the car, it just cracked. No heater or defrost was on. It took 6 months for replacement due to Land Rover ordering the wrong windshield and back orders. During this time the windshield got 3 more chips from pebbles/small rocks while driving. 2 weeks after this replacement a small rock hit the windshield on the driver side and chipped it about the size of a nickel. I am getting this filled tomorrow. This

is clearly a defect with the windshield as I have had maybe 2 broken windshields in my life up to this point.

- NHTSA Complaint No. 11462763, April 29, 2022 (Incident Date April 29, 2022): Windshield cracked spontaneously while washing. No chips, no damage and hand washed vehicle. Crack is blocking visibility and starts at top of windshield and spiders into 3 cracks.

- NHTSA Complaint No. 11469526, June 16, 2022 (Incident Date May 22, 2022): My windshield crack on its own when it was not even being driven. It appears to be a stress crack as it is a small V at the top center comes down the middle and across the passenger side. Only owned the car a few months and barely driven. I took to the dealer and they said they wouldn't chance covering by warranty out of fear corporate would deny the claim. Spoke with corporate and after a month they finally responded and said they wouldn't cover or have anyone further inspect as they rely on their dealers only and if I was satisfied I should go through arbitration. This appears to be a known issue now and concerning that they wouldn't want to investigate further. My windshield is heated and I wonder if there is a design flaw in the filament put inside the glass? Upsetting to deal with and shocked by lack or responsiveness from Land Rover.

- NHTSA Complaint No. 11470350, June 21, 2022 (Incident Date June 21, 2022): My land Rover Defender is 5 months old with 5,765 miles on it. Driving through the car wash today the windshield "popped" and a large crack started in the top center and spread out both directions in what looks like a mustache. No chip, vehicle was not moving and the windshield failed. Unacceptable.

- NHTSA Complaint No. 11470701, June 23, 2022 (Incident Date June 3, 2022): Windshield cracked for no reason. ie no chip caused by rock, etc. Happened while I was driving with no traffic.

- NHTSA Complaint No. 11471080, June 27, 2022 (Incident Date June 26, 2022): Windshield crack from no none source, appears to be pressure related. Happened at highway speed. Reading Defender forums this has happened to many customers, some 2-3 times.

- NHTSA Complaint No. 11478479, August 9, 2022 (Incident Date August 9, 2022): 2 complete windshield replacements needed since taking delivery June 2021. This incident was a small chip from a rock on the road that then spread across bottom half of drivers side windshield. These incidents are not isolated, seems other owners are reporting the same thing on this vehicle.

- NHTSA Complaint No. 11481788, August 29, 2022 (Incident Date August 21, 2022): The windshield spontaneously cracked from the middle of the pillar on the driver's side to the center of the windshield. No rock strikes.

*2022 Defender NHTSA Complaints*:

- NHTSA Complaint No. 11439215, November 3, 2021 (Incident Date September 21, 2021): My windshield broke in only owning this car 30 days I hear from other people that this is there 3 time replacement. I think this is a design issues and should be looked into.

- NHTSA Complaint No. 11443713, December 13, 2021 (Incident Date December 12, 2021): My windshield spontaneously cracked. No impact, just a sudden cracking noise and the crack appeared shortly thereafter. I was in the car at the time. No impact with anything was noted. (I have had chips many times and this was not that sound). The crack starts at the lower midline of the windshield, extends up about 9" before arcing horizontally. This crack is near identical to at least three other owners of the same car. All had their windshield spontaneously crack in the same manner i describe. No impact noted. The pattern of crack and location is always lower border to the midline of the windshield. One fellow owner is a friend who joked about when I'd have to replace my windshield in my brand new Defender. He experienced the same thing. I believe it may relate to use of the defogger. Heat in the car with colder temps outside. I'm in WA so no extreme temps here. was about 35F outside when the defogger was used. That is the only thing I can think of. Pictures can be provided upon request. The cracks are too similar in location and dimension and too spontaneous (no strike noted) to be anything other that an integral design flaw. Part: Windshield Safety issue: Windshield integrity contributes to the strength of the vehicle in a rollover/accident so I believe this flaw has a direct safety impact for owners of the new Land Rover Defender. Dealer: As this is glass, dealer will not entertain warranty issues but it appears to be just that. I won't waste time contacting dealership. Others have on this matter. No point. No warning signs It has not been inspected by anyone.

- NHTSA Complaint No. 11451600, February 11, 2022 (Incident Date February 10, 2022): Windshield spontaneously cracked while parked (no impact). Crack was near top center and runs across the safety camera system. Crack was also instantaneously 1.5 foot long and partially obstructs driver's view. Scheduled for inspection by dealership - police, insurance has not been involved. No warning lamps or messages have appeared before or after the crack formed.

- NHTSA Complaint No. 11453301, February 21, 2022 (Incident Date February 17, 2022): Easily cracked windshield. Less than 30 days owned and a small pebble cracked my windshield.

- NHTSA Complaint No. 11462763, April 29, 2022 (Incident Date April 29, 2022): Windshield cracked spontaneously while washing. No chips, no damage and hand washed vehicle. Crack is blocking visibility and starts at top of windshield and spiders into 3 cracks.

- NHTSA Complaint No. 11464909, May 16, 2022 (Incident Date May 14, 2022): For the SECOND time, my windshield cracked in the upper right corner with no impact. The second time, I wasn't even driving! The crack looks nearly identical, even as it runs. I paid for a new windshield the first time because they insisted that a rock hit me,

although none of the people in the car ever heard or saw that. This time, I wasn't even driving.

- NHTSA Complaint No. 11469526, June 16, 2022 (Incident Date May 22, 2022): My windshield crack on its own when it was not even being driven. It appears to be a stress crack as it is a small V at the top center comes down the middle and across the passenger side. Only owned the car a few months and barely driven. I took to the dealer and they said they wouldn't chance covering by warranty out of fear corporate would deny the claim. Spoke with corporate and after a month they finally responded and said they wouldn't cover or have anyone further inspect as they rely on their dealers only and if I was satisfied I should go through arbitration. This appears to be a known issue now and concerning that they wouldn't want to investigate further. My windshield is heated and I wonder if there is a design flaw in the filament put inside the glass? Upsetting to deal with and shocked by lack or responsiveness from Land Rover.

- NHTSA Complaint No. 11470350, June 21, 2022 (Incident Date June 21, 2022): My land Rover Defender is 5 months old with 5,765 miles on it. Driving through the car wash today the windshield "popped" and a large crack started in the top center and spread out both directions in what looks like a mustache. No chip, vehicle was not moving and the windshield failed. Unacceptable.

- NHTSA Complaint No. 11481788 / 11493632, November 15, 2022 (Incident Date September 23, 2022): I Have a 2022 Land Rover defender 110 and it had 8,000 miles on it. One day I was driving and the windshield just cracked, nothing had hit it and no visible chips were present. I have yet to receive a replacement windshield.

175.    By contrast, during the same time period NHTSA showed zero complaints of windshields cracking or chipping in 2020-2022 Land Rover vehicles other than Defender, and in the years 2015 through 2019 only five windshield cracking or chipping complaints were posted, averaging one complaint a year.  Thus the volume and frequency of such complaints alerted Land Rover that the Class Vehicles suffered from defective windshields.

176.    Although Land Rover was aware of the widespread nature of the Defect in the Class Vehicles, and that it posed grave safety risks, Land Rover has failed to take adequate steps to notify all Class Vehicle owners of the Defect and provide relief.

177.    Customers have reported the Defect in the Class Vehicles to Land Rover directly and through its dealers.  Defendants are fully aware of the Defect contained in the Class

Vehicles.  Moreover, Defendants had the ability to notify Class Vehicle owners about the Defect directly and via its authorized dealerships at the time of sale and thereafter. Nevertheless, Defendants actively concealed the existence and nature of the Defect from Plaintiffs and the other Class Members at the time of purchase or repair and thereafter.  Specifically, Defendants:

    a. failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the Defect;

    b. failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their front windshields were not in good working order, were defective, and were not fit for their intended purpose; and,

    c. failed to disclose and/or actively concealed the fact that the Class Vehicles and their front windshields were defective, despite the fact that Defendants learned of the Defect as early as 2020.

178.    Defendants have deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at its dealerships or other third-party repair facilities and/or take other remedial measures related to the Defect contained in the Class Vehicles.

179.    Defendants have not recalled the Class Vehicles to repair the Defect, has not issued any bulletins or instructions to its dealerships regarding the Defect, has not offered to its customers a suitable repair or replacement of parts related to the Defect free of charge, and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Defect.

180.    Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

181.    As a result of the Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.  Reasonable consumers, like Plaintiffs, expect and assume that a vehicle's front windshield is not defective and will not crack, chip and/or fracture for no reason at all or under circumstances that would not cause non-defective windshields to similarly fail.  Plaintiffs and Class Members further expect and assume that Land Rover will not sell or lease vehicles with known safety defects, such as the Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.  They do not expect that Land Rover would fail to disclose the Defect to them, and then refused to remedy the defect under Land Rover's warranty.

## CLASS ACTION ALLEGATIONS

### A.    The Classes

182.    Pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4), Plaintiffs seek to represent the following classes:

**Nationwide Class:** All persons or entities who purchased or leased any 2020-2022 Land Rover Defender vehicle in in the United States.

183.    In addition or as an alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure Rule 23(c)(5) and/or the respective state statute(s), Plaintiffs seek to represent all members of the following Subclass or Subclasses of the Class (and/or classes comprised of additional states to the extent the laws of any state are substantially similar to the laws of any state in which Plaintiffs purchased their Class Vehicles), as well as any subclasses or issue classes as Plaintiffs may propose and/or this Court may designate at the time of class certification:

**Utah Class:** All persons or entities who purchased or leased any 2020-2022 Land Rover Defender vehicle in the State of Utah (the "Utah Class")

**New Jersey Class:** All persons or entities who purchased or leased any 2020-2022 Land Rover Defender vehicle in the State of New Jersey (the "New Jersey Class")

**Florida Class:** All persons or entities who purchased or leased any 2020-2022 Land Rover Defender vehicle in the State of Florida (the "Florida Class")

**California Class:** All persons or entities who purchased or leased any 2020-2022 Land Rover Defender vehicle in the State of California (the "California Class")

**Colorado Class:** All persons or entities who purchased or leased any 2020-2022 Land Rover Defender vehicle in the State of Colorado (the "Colorado Class")

**Louisiana Class:** All persons or entities who purchased or leased any 2020-2022 Land Rover Defender vehicle in the State of Louisiana (the "Louisiana Class")

184.    Defendants and their employees or agents are excluded from the Class.

### B.  Numerosity

185.    Upon information and belief, the Classes are each so numerous that joinder of all members is impracticable. While the identities of individual members of the Classes are unknown at this time, thousands of Class Vehicles have been sold and leased throughout California, Colorado, Florida, Louisiana, New Jersey, and Utah.

### C.  Common Questions of Law and Fact

186.    There are questions of law and fact common to the Classes that predominate over any questions affecting only individual Class members.  These questions include:

a.      whether the Class Vehicles suffer from the Defect;

b.      whether the Defect constitutes an unreasonable safety hazard;

c.      whether Defendants know about the Defect and, if so, how long Defendants have known of the Defect;

d.    whether the defective nature of the Class Vehicles' front windshield constitutes a material defect;

e.    whether Defendants had and have a duty to disclose the defective nature of the Class Vehicles' front windshield to Plaintiffs and the other Class Members;

f.    whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

g.    whether Defendants knew or reasonably should have known of the Defect contained in the Class Vehicles before it sold or leased them to Class Members; and

h.    Whether Defendants breached the implied warranty of merchantability, engaged in fraudulent concealment and unjust enrichment, and whether Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.,* the Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq.*, Florida Deceptive and Unfair Trade Practices Act, F.S.A. § 501.201, *et seq.,* California Consumers Legal Remedies Act, Cal. Civil Code §§ 1750, *et seq.*, California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*, as alleged in this Second Amended Complaint.

**D.    Typicality**

187.    The Plaintiffs' claims are typical of the claims of the Classes since Plaintiffs purchased or leased defective Class Vehicles, as did each member of the Classes. Furthermore, Plaintiffs and all members of the Classes sustained economic injuries arising out of Defendants'

wrongful conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

### E.   Protecting the Interests of the Class Members

188.   Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel experienced in handling class actions and claims involving unlawful business practices.  Neither Plaintiffs nor their counsel has any interest which might cause them not to vigorously pursue this action.

### F.   Proceeding Via Class Action is Superior and Advisable

189.   A class action is the superior method for the fair and efficient adjudication of this controversy.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them.  Even if the members of the Classes could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Classes can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

190.   Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

**FIRST CAUSE OF ACTION**
**Fraudulent Concealment**
**(Plaintiffs on behalf of the Nationwide Class or in the alternative the California, Colorado, Florida, New Jersey, and Utah Classes)**

191.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

192.    By affirmatively misrepresenting the Class Vehicles as durable and tough, and by failing to disclose and concealing the defective nature of the Class Vehicles' front windshield from Plaintiffs and Class Members, Land Rover UK concealed and suppressed material facts concerning the performance and quality of the Class Vehicles.

193.    Defendants knew that the Class Vehicles' front windshields suffered from an inherent defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

194.    Defendants were under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles' front windshields and/or the associated repair costs because:

a.    Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles' front windshields;

b.    Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

c.    Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that their front windshields have a dangerous safety defect until after they purchased the Class Vehicles; and,

d.    Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn about or discover the Defect.

195.    On information and belief, Land Rover UK still has not made full and adequate disclosures and continues to defraud consumers by concealing material information regarding the Defect and the performance and quality of Class Vehicles.

196.    The facts concealed or not disclosed by Defendants to Plaintiffs and Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

197.    Plaintiffs and the Classes relied on Defendants to disclose material information they knew, such as the defective nature of the windshields in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendants disclosed this information.

198.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

199.    The facts concealed or not disclosed by Defendants to Plaintiffs and the other Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

200.    Had Plaintiffs and other Class Members known that the Class Vehicles suffer from the Defect, they would not have purchased the Class Vehicles or would have paid less for them.

201.    Plaintiffs and the other Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Defect.  That is the reasonable and objective consumer expectation for vehicles.

202.    As a result of Defendants' misconduct, Plaintiffs and the other Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are

defective and require repairs or replacement parts and are worth less money because of the Defect.

203.    Accordingly, Land Rover UK is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

204.    Land Rover UK's actions and omissions were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, to enrich Land Rover UK. Land Rover UK's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

205.    Furthermore, as the intended and expected result of its fraud and conscious wrongdoing,  Land Rover UK has profited and benefited from Plaintiffs' and Class Members' purchase of Class Vehicles containing the Defect.  Land Rover UK has voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of Land Rover UK's misconduct alleged herein, Plaintiffs and Class Members were not receiving vehicles of the quality, nature, fitness, or value that had been represented by Land Rover UK, and that a reasonable consumer would expect.

206.    Land Rover UK has been unjustly enriched by its fraudulent, deceptive, and otherwise unlawful conduct in connection with the sale and lease of Class Vehicles and by withholding benefits from Plaintiffs and Class Members at the expense of these parties. Equity and good conscience militate against permitting Land Rover to retain these profits and benefits, and Land Rover should be required to make restitution of its ill-gotten gains resulting from the conduct alleged herein.

207.    Plaintiffs Cerutti, Bishop, Guidorizzi, and Richards seek damages and injunctive and equitable relief for themselves and for the Nationwide Class or in the alternative the California, Colorado, Florida, and New Jersey Classes. Plaintiff Rains seeks damages for himself and injunctive and equitable relief for himself and the Utah Class.

<u>SECOND CAUSE OF ACTION</u>
**Unjust Enrichment**
**(Plaintiffs on behalf of the Nationwide Class or in the alternative the California, Colorado, Florida, Louisiana, New Jersey, and Utah Classes)**

208.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

209.    Land Rover UK has long known that about the Defect which it concealed and failed to disclose to Plaintiffs and Class Members.

210.    As a result of their fraudulent acts and omissions related to the Defect, Land Rover UK obtained monies which rightfully belong to Plaintiffs and the Class Members to the detriment of Plaintiffs and Class Members.

211.    Land Rover UK appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the proposed Class Members who, without knowledge of the Defect, paid a higher price for their vehicles which actually had lower values.   Land Rover UK also received monies for vehicles that Plaintiffs and the Class Members would not have otherwise purchased or leased.

212.    It would be inequitable and unjust for Land Rover UK to retain these wrongfully obtained profits.

213.    Land Rover UK's retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

214.     As a result of Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

215.     Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendants obtained as a result of its unjust conduct.

216.     Additionally, Plaintiffs seek injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identifies. Plaintiffs also seek injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect; compelling Defendants to provide Class members with adequate repairs or with replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

### THIRD CAUSE OF ACTION
**Violation of the New Jersey Consumer Fraud Act,**
**N.J.S.A. § 56:8-1,** *et seq.*
**(Plaintiffs on behalf of the Nationwide Class or in the alternative Plaintiff Cerutti on behalf of the New Jersey Class)**

217.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

218.     Plaintiffs, the Class Members, and Defendants are each a "person" under N.J.S.A. § 56:8-1(1)(d).

219. At all relevant times, Defendants have engaged in "advertisement" and "sale" under N.J.S.A. §§ 56:8-1(1)(a) and (1)(e) by advertising, offering for sale, selling, leasing, and/or distributing vehicles in the United States, including in New Jersey, directly or indirectly affecting New Jersey citizens through that trade and commerce.

220. The allegations set forth herein constitute unfair and deceptive acts and practices in violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*

221. By failing to disclose and concealing the Defect from Plaintiffs and Class Members, Defendants violated the New Jersey Consumer Fraud Act, because, *inter alia,* Defendants represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.

222. Defendants' unfair and deceptive acts and practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

223. Defendants knew that the Class Vehicles suffer from the Defect, were defectively manufactured or made, and were not suitable for their intended use.

224. Defendants were under a duty to Plaintiffs and the Class Members to disclose the Defect because:

    a. Defendants were in a superior position to know the true state of facts about the Defect contained in the Class Vehicles;

    b. Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

    c.    Plaintiffs and Class Members could not reasonably have been expected to learn or discover that their vehicles have a dangerous safety defect until after they purchased the Class Vehicles; and,

    d.    Defendants knew that Plaintiffs and Class Members could not reasonably have been expected to learn about or discover the Defect.

225.    The facts concealed or not disclosed by Defendants to Plaintiffs and the Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

226.    Plaintiffs and the Class Members relied on Defendants to disclose material information they knew, such as the Defect in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendants disclosed this information.

227.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

228.    Moreover, Defendants' intentional concealment of and failure to disclose the Defect constitutes an unfair and deceptive act and practice because, to the detriment of Plaintiffs and Class Members, that conduct took advantage of Plaintiffs and the Class Members' lack of knowledge, ability, and experience to a grossly unfair degree.  Defendants' unfair and deceptive trade practices were a producing cause of the economic damages sustained by Plaintiffs and the Class Members.

229.    The facts concealed or not disclosed by Defendants to Plaintiffs and the Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

230.    Had Plaintiffs and the Class Members known that the Class Vehicles would suffer from the Defect, they would not have purchased the Class Vehicles or would have paid substantially less for them.

231.    Plaintiffs and the Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Defect.  That is the reasonable and objective consumer expectation for vehicles.

232.    As a result of Defendants' misconduct, Plaintiffs and the Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement and are worth less money because of the Defect.

233.    Plaintiffs and the Class Members have each suffered an ascertainable loss as a result of Defendants' misconduct.  The loss is equal to or in excess of the cost of replacing the Class Vehicle's defective windshields with non-defective windshields.

234.    Plaintiffs and the Class Members should be awarded three times the amount of their economic damages because Defendants intentionally concealed and failed to disclose the defective nature of the Class Vehicles.

235.    Pursuant to N.J.S.A. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint within 10 days of its filing.

## FOURTH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability under N.J.S.A. § 12A:2-314
### (Plaintiff Cerutti on behalf of the proposed New Jersey Class)

236.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

237.    Defendants are merchants with respect to motor vehicles.

238.    The Class Vehicles were subject to implied warranties of merchantability running from the Defendants to Plaintiff Cerutti and the New Jersey Class Members.

239.    An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

240.    Defendants breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in merchantable condition when Plaintiff Cerutti and the New Jersey Class Members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles are used. Specifically, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from a Defect that can make driving unreasonably dangerous.

241.    As a result of Defendants' breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

<u>**FIFTH CAUSE OF ACTION**</u>
**Violation of the Utah Consumer Sales Practices Act,**
**Utah Code Ann. § 13-11-1, *et seq.***
**(Plaintiff Rains on behalf of the proposed Utah Class)**

242.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

243.    Plaintiff Rains, the Utah Class Members, and Defendants are each a "person" under Utah Code Ann. § 13-11-3(5).

244.     Defendants are each a "supplier" under Utah Code Ann. § 13-11-3(6) because Defendants, directly or indirectly, regularly solicit, engage in, or enforces consumer transactions in the United States, including Utah.

245.     At all relevant times, Defendants have engaged in "consumer transactions[s]" under Utah Code Ann. § 13-11-3(2) by advertising, offering for sale, selling, leasing, and/or distributing vehicles in the United States, including Utah, directly or indirectly affecting Utah citizens through that trade and commerce.

246.     The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Utah's Consumer Sales Practices Act, Utah Code Ann. § 13-11-4.

247.     By failing to disclose and concealing the Defect from Plaintiff Rains and Utah Class Members, Defendants violated the Utah Consumer Sales Practices Act as they represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.

248.     Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

249.     Defendants knew that the Class Vehicles suffered from the Defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

250.     Defendants were under a duty to Plaintiff Rains and Utah Class Members to disclose the defective nature of the Class Vehicles because:

a. Defendants were in a superior position to know the true state of facts about the Defect contained in the Class Vehicles;

b. Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

c. Plaintiff Rains and Utah Class Members could not reasonably have been expected to learn or discover that their vehicles have a dangerous safety defect until after they purchased the Class Vehicles; and,

d. Defendants knew that Plaintiff Rains and Utah Class Members could not reasonably have been expected to learn about or discover the Defect.

251.    The facts concealed or not disclosed by Defendants to Plaintiff Rains and Utah Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

252.    Plaintiff Rains and Utah Class Members relied on Defendants to disclose material information they knew, such as the Defect in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendants disclosed this information.

253.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

254.    Moreover, Defendants' intentional concealment of and failure to disclose the Defect constitutes an "unconscionable act or practice" under Utah Code Ann. § 13-11-5 because, to the detriment of Plaintiff Rains and Utah Class Members, that conduct took advantage of Plaintiff and Class Members' lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable act or practice" was a producing cause of the economic damages sustained by Plaintiff Rains and Utah Class Members.

255.    The facts concealed or not disclosed by Defendants to Plaintiff Rains and other Utah Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

256.    Had Plaintiff Rains and other Utah Class Members known that the Class Vehicles would suffer from the Defect, they would not have purchased the Class Vehicles or would have paid less for them.

257.    Plaintiff Rains and the other Utah Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Defect.  That is the reasonable and objective consumer expectation for vehicles.

258.    As a result of Defendants' misconduct, Plaintiff Rains and the other Utah Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement and are worth less money because of the Defect.

259.    Plaintiff Rains and Utah Class Members should be awarded punitive damages because Defendants intentionally concealed and failed to disclose the defective nature of the Class Vehicles.

260.    Additionally, Plaintiff Rains and Utah Class Members seek injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identifies. Plaintiff Rains and Utah Class Members also seek injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect; compelling Defendants to provide Class Members with adequate repairs or with replacement components that do not contain the defects alleged herein; and/or compelling Defendants to

reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**SIXTH CAUSE OF ACTION**
**Violation of Florida Deceptive and Unfair Trade Practices Act,**
**F.S.A. § 501.201, *et seq.***
**(Plaintiff Bishop on behalf of the proposed Florida Class)**

261.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

262.    Plaintiff Bishop and the Florida Class Members are each an "interested party or person" and "consumer" as defined by F.S.A. 501.203(6) and (7) respectively.

263.    At all relevant times, Defendants have engaged in "Trade" and "Commerce" as defined by F.S.A. 501.203(8) by advertising, offering for sale, selling, leasing, and/or distributing vehicles in the United States, including Florida, directly or indirectly affecting Florida citizens though that trade and commerce.

264.    The allegations set forth herein constitute false, misleading, unlawful or deceptive trade practice under F.S.A. 501.201, *et seq*.

265.    By failing to disclose and concealing the Defect from Plaintiff Bishop and Florida Class Members, Defendants violated the Florida Deceptive and Unfair Trade Practices Act as they represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.

266.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

267.    Defendants knew that the Class Vehicles suffered from the Defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

268.    Defendants were under a duty to Plaintiff Bishop and Florida Class Members to disclose the defective nature of the Class Vehicles because:

a.    Defendants were in a superior position to know the true state of facts about the Defect contained in the Class Vehicles;

b.    Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

c.    Plaintiff Bishop and Florida Class Members could not reasonably have been expected to learn or discover that their vehicles have a dangerous safety defect until after they purchased the Class Vehicles; and,

d.    Defendants knew that Plaintiff Bishop and Florida Class Members could not reasonably have been expected to learn about or discover the Defect.

269.    The facts concealed or not disclosed by Defendants to Plaintiff Bishop and Florida Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

270.    Plaintiff Bishop and Florida Class Members relied on Defendants to disclose material information they knew, such as the Defect in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendants disclosed this information.

271.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

272.    Moreover, Defendants' intentional concealment of and failure to disclose the Defect took advantage of Plaintiff Bishop and Florida Class Members' lack of knowledge, ability, and experience to a grossly unfair degree.

273.    The facts concealed or not disclosed by Defendants to Plaintiff Bishop and Florida Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

274.    Had Plaintiff Bishop and Florida Class Members known that the Class Vehicles would suffer from the Defect, they would not have purchased the Class Vehicles or would have paid less for them.

275.    Plaintiff Bishop and Florida Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Defect.  That is the reasonable and objective consumer expectation for vehicles.

276.    As a result of Defendants' misconduct, Plaintiff Bishop and Florida Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement and are worth less money because of the Defect.

277.    Plaintiff Bishop and Florida Class Members should be awarded punitive damages because Defendants intentionally concealed and failed to disclose the defective nature of the Class Vehicles.

## SEVENTH CAUSE OF ACTION
### Violation of the California Consumers Legal Remedies Act,
### Cal. Civil Code §§ 1750, *et seq.*
### (Plaintiff Guidorizzi on behalf of the proposed California Class)

278.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

279.    The California Consumers Legal Remedies Act, Cal. Civil Code §§ 1750, *et seq*. ("CLRA") prohibits various deceptive practices in connection with the conduct of a business providing goods, property, or services to consumers primarily for personal, family, or household purposes.  The self-declared purposes of the CLRA are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection. Cal. Civil Code § 1760.

280.    Defendants are each a "person" as defined in Cal. Civil Code § 1761(c).

281.    Plaintiff Guidorizzi and the California Class Members are "consumers" as defined in Cal. Civil Code § 1761(d).

282.    The Class Vehicles constitute "goods" and "services," as defined by Cal. Civ. Code § 1761(a) and (b).

283.    Plaintiff Guidorizzi and California Class Members' purchases or leases of the Class Vehicles constitute "transactions," as defined by Cal. Civ. Code § 1761(e).

284.    Plaintiff Guidorizzi and California Class Members purchased or leased the Class Vehicles for personal, family, and household purposes, as defined by Cal. Civ. Code § 1761(d).

285.    Defendants violated California Civil Code § 1770(a)(5), (7), (14), and (16) when they sold or leased Plaintiff Guidorizzi and California Class Members the Class Vehicles with knowledge that they contained the Defect and knowingly concealed said defects from Plaintiff

Guidorizzi and California Class Members with the intent that they rely upon Defendants' concealment.

286.    The Class Vehicles' Defect poses an unreasonable safety risk to consumers and other members of the public with whom they share the road.  Defendants had exclusive knowledge of the defect and has actively concealed it from consumers.

287.    In the course of Defendants' business, Defendants willfully failed to disclose and actively concealed that the Class Vehicles are defective. The existence of the Defect, which manifests in all or substantially all of the Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair expenses, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.

288.    In purchasing or leasing the Class Vehicles, Plaintiff Guidorizzi and California Class Members were deceived by Defendants' failure to disclose that the Class Vehicles suffered from the Defect as described above, or that Defendants would not repair or replace such defect as required under applicable warranties.

289.    In purchasing or leasing the Class Vehicles, Plaintiff Guidorizzi and Class Members were deceived by Defendants' failure to disclose that the Class Vehicles' windshields are substantially likely to fail and crack in the course of ordinary use of the Class Vehicles.

290.    Defendants owed Plaintiff Guidorizzi and California Class Members a duty to disclose the truth about the Defect because:

      a.    Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' windshields;

    b.   Defendants knew that the Class Vehicles and their windshields suffered from an inherent defect, were defectively made and/or manufactured, and were not suitable for their intended use;

    c.   Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and their windshields; and

    d.   Defendants actively concealed the defective nature of the Class Vehicles and their windshields from Plaintiff Guidorizzi and California Class Members.

291.    Defendants intentionally and knowingly concealed material facts regarding the Class Vehicles with an intent to mislead Plaintiff Guidorizzi and California Class Members.

292.    Plaintiff Guidorizzi and Class Members reasonably relied upon Defendants' false misrepresentations. They had no way of knowing that Defendants' representations were false and gravely misleading.

293.    Plaintiff Guidorizzi and California Class Members were unaware of the Defect and would not have purchased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, of such defects in the Class Vehicles.

294.    As a result of Defendants' acts, Plaintiff Guidorizzi and Class Members have suffered damages. Plaintiff Guidorizzi and Class Members would not have purchased or leased Class Vehicles had the Defect and associated risks and costs been disclosed to them.  They are left with vehicles of diminished value and utility because of such defect, which continues to pose a safety risk and will continue to require future repairs and replacement parts at Class Vehicle owners' expense.

295.    Plaintiff Guidorizzi seeks an order requiring Defendants to immediately disclose the existence of the Defect and associated risks to all existing and prospective customers, to repair the defect and all resulting damage in Class Vehicles free of charge, and to cease selling new or certified pre-owned Class Vehicles through its dealerships until the defect is remedied.

296.    Plaintiff Guidorizzi provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a).  To date, Defendants have failed to provide appropriate relief for its violations of the CLRA. Therefore, Plaintiff Guidorizzi and California Class Members seek monetary, compensatory, and punitive damages, in addition to injunctive and equitable relief.

## EIGHTH CAUSE OF ACTION
### Violation of California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (Plaintiff Guidorizzi on behalf of the proposed California Class)

297.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

298.    California's Unfair Competition Law ("UCL"), California's Bus. & Prof. Code, § 17200, prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

299.    The Class Vehicles' Defect poses an unreasonable safety risk to consumers and other members of the public with whom they share the road. Defendants had exclusive knowledge of the defect and has actively concealed it from consumers.

300.    In the course of Defendants' business, Defendants willfully failed to disclose and actively concealed that the Class Vehicles are defective. The existence of the Defect, which manifests in all or substantially all of the Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair

70

expenses, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.

301.    In purchasing or leasing the Class Vehicles, Plaintiff Guidorizzi and California Class Members were deceived by Defendants' failure to disclose that the Class Vehicles suffer from the Defect as described above, or that Defendants would not cure such defect as required under applicable warranties.

302.    In purchasing or leasing the Class Vehicles, Plaintiff Guidorizzi and California Class Members were deceived by Defendants' failure to disclose that the Class Vehicles' windshield is substantially likely to fail in the course of ordinary vehicle operation.

303.    Defendants owed Plaintiff Guidorizzi and California Class Members a duty to disclose the truth about the Defect because:

a.    Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' windshields;

b.    Defendants knew that the Class Vehicles and their windshields suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use;

c.    Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and their windshields; and

d.    Defendants actively concealed the defective nature of the Class Vehicles and their windshields from Plaintiff Guidorizzi and California Class Members.

304.    Defendants intentionally and knowingly concealed material facts regarding the Class Vehicles with the intent to mislead Plaintiff Guidorizzi and California Class Members.

305.    Plaintiff Guidorizzi and California Class Members reasonably relied upon Defendants' false misrepresentations. They had no way of knowing that Defendants' representations were false and gravely misleading.

306.    Plaintiff Guidorizzi and California Class Members were unaware of the Defect and that the Class Vehicles' windshields are substantially likely to fail in the course of normal everyday driving conditions and would not have purchased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, of such defects in the Class Vehicles.

307.    Plaintiff Guidorizzi and California Class Members are reasonable consumers who do not expect their vehicles to suffer from the Defect.

308.    Defendants knew the Class Vehicles and their windshields suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

309.    In failing to disclose the defects with the Class Vehicles' windshields, Defendants have knowingly and intentionally concealed material facts and breached its duty not to do so.

310.    The facts Defendants concealed from or failed to disclose to Plaintiff Guidorizzi and California Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease the Class Vehicles.  Had Plaintiff Guidorizzi and California Class Members known that the Class Vehicles suffered from the Defect and posed a safety hazard, they would not have purchased or leased the Class Vehicles or would have paid less for them.

311.    Defendants continued to conceal the defective nature of the Class Vehicles and the Defect even after the Class Members began to report problems.

312.    Defendants' conduct was and is likely to deceive consumers.

313.    Defendants' acts, conduct and practices were unlawful, in that they constituted:

a.    Violations of the California Consumer Legal Remedies Act; and

b.    Violations of the Song-Beverly Consumer Warranty Act.

314.    By their conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

315.    Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

316.    As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiff Guidorizzi and California Class Members have suffered and will continue to suffer actual damages.

317.    The Class Vehicles are worth less with the Defect.

318.    Defendants have been unjustly enriched and should be required to make restitution to Plaintiff Guidorizzi and California Class Members pursuant to §§ 17203 and 17204 of the Business & Professions Code.

319.    Further, Plaintiff Guidorizzi seeks an order enjoining Defendants from committing such unlawful, unfair, and fraudulent business practices, and seek the full amount of money Plaintiff Guidorizzi and California Class Members paid for the Class Vehicles and/or restitutionary disgorgement of profits from Defendants.  They also seek injunctive relief compelling Defendants to provide Class members with replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranty, in a

manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed.

320.    Plaintiffs also seek attorneys' fees and costs under Cal Code Civ. Proc. § 1021.5.

321.    Money damages are not an adequate remedy for the above requested non-monetary injunctive relief because to date Defendants have not agreed to repair or replace Class Vehicles' windshields with non-defective windshields under its warranty, and Defendants have not developed or released to the public non-defective replacement windshields for the Class Vehicles.

### NINTH CAUSE OF ACTION
**Breach of Implied Warranty pursuant to Song-Beverly Consumer Warranty Act – Cal. Civ. Code §§ 1792 and 1791.1, *et seq.* (Plaintiff Guidorizzi on behalf of the proposed California Class)**

322.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

323.    Defendants are each a merchant with respect to motor vehicles.

324.    The Class Vehicles were subject to implied warranties of merchantability running from the Defendants to Plaintiff Guidorizzi and the California Class Members.

325.    An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

326.    Defendants breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in merchantable condition when Plaintiff Guidorizzi and the California Class Members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles are used. Specifically, the Class Vehicles were and are not fit for their

ordinary purpose of providing reasonably reliable and safe transportation because the Class

Vehicles suffer from a Defect that can make driving unreasonably dangerous.

327.    As a result of Defendants' breach of the applicable implied warranties, owners

and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value

of their Class Vehicles.

328.    Additionally, as a result of the Defect, Plaintiff Guidorizzi and the California

Class Members were harmed and suffered actual damages.

329.    Defendants' actions, as complained of herein, breached the implied warranty that

the Class Vehicles were of merchantable quality and fit for such use in violation of California

Civil Code §§ 1792 and 1791.1.

**TENTH CAUSE OF ACTION**
**Violation of the Colorado Consumer Protection Act,**
**Colo. Rev. Stat. § 6-1-101, *et seq.***
**(Plaintiff Richards on behalf of the proposed Colorado Class)**

330.    Plaintiffs incorporate by reference all allegations contained in this Complaint as

though fully stated herein.

331.    Colorado's Consumer Protection Act (the "CCPA") prohibits a person from

engaging in a "deceptive trade practice," which includes knowingly making "a false

representation as to the source, sponsorship, approval, or certification of goods," or "a false

representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of

goods." Colo. Rev. Stat. § 6-1-105(1)(b), (e). Deceptive practices prohibited by the CCPA

include "fail[ing] to disclose material information concerning goods, services, or property which

information was known at the time of an advertisement or sale if such failure to disclose such

information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. §

6-1-105.

332.    Defendants are each a "person" under Colo. Rev. Stat. § 6-1-102(6).

333.    Plaintiff Richards and the Colorado Class Members are "consumers" for purposes of Colo. Rev. Stat. § 6-1-113(1)(a).

334.    The allegations set forth herein constitute unfair and deceptive acts and practices in violation of the Colorado's Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*

335.    By failing to disclose and concealing the Defect from Plaintiff Richards and the Colorado Class Members, Defendants violated the CCPA, because, *inter alia,* Defendants represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.

336.    Defendants' unfair and deceptive acts and practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

337.    Defendants knew that the Class Vehicles suffer from the Defect, were defectively manufactured or made, and were not suitable for their intended use.

338.    Defendants were under a duty to Plaintiff Richards and the Colorado Class Members to disclose the Defect because:

    a.    Defendants were in a superior position to know the true state of facts about the Defect contained in the Class Vehicles;

    b.    Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively manufactured, and were not suitable for their intended use;

      c.    Plaintiff Richards and the Colorado Class Members could not reasonably have been expected to learn or discover that their vehicles have a dangerous safety defect until after they purchased the Class Vehicles; and,

      d.    Defendants knew that Plaintiff Richards and the Colorado Class Members could not reasonably have been expected to learn about or discover the Defect.

339.    The facts concealed or not disclosed by Defendants to Plaintiff Richards and the Colorado Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

340.    Plaintiff Richards and the Colorado Class Members relied on Defendants to disclose material information they knew, such as the Defect in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendants disclosed this information.

341.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached theirs duty not to do so.

342.    Moreover, Defendants' intentional concealment of and failure to disclose the Defect constitutes an unfair and deceptive act and practice because, to the detriment of Plaintiff Richards and the Colorado Class Members, that conduct took advantage of Plaintiff Richards and the Colorado Class Members' lack of knowledge, ability, and experience to a grossly unfair degree. Defendants' unfair and deceptive trade practices were a producing cause of the economic damages sustained by Plaintiff Richards and the Colorado Class Members.

343.    The facts concealed or not disclosed by Defendants to Plaintiff Richards and the Colorado Class Members are material because a reasonable consumer would have considered

them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

344.    Had Plaintiff Richards and the Colorado Class Members known that the Class Vehicles would suffer from the Defect, they would not have purchased the Class Vehicles or would have paid substantially less for them.

345.    Plaintiff Richards and the Colorado Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Defect.  That is the reasonable and objective consumer expectation for vehicles.

346.    As a result of Defendants' misconduct, Plaintiff Richards and the Colorado Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles are defective and require repairs or replacement and are worth less money because of the Defect.

347.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff Richards seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for Plaintiff Richards and each Colorado Class Member.

348.    Plaintiff Richards and Colorado Class Members also seek punitive damages because Defendants engaged in aggravated and outrageous conduct.

349.    Plaintiff Richards also seeks an order enjoining Defendants' unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the CCPA.

## ELEVENTH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability under Colo. Rev. Stat. § 4-2-314
### (Plaintiff Richards on behalf of the proposed Colorado Class)

350.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

351.    Defendants are each a merchant with respect to motor vehicles.

352.    The Class Vehicles were subject to implied warranties of merchantability running from the Defendants to Plaintiff Richards and the Colorado Class Members.

353.    An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

354.    Defendants breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in merchantable condition when Plaintiff Richards and the Colorado Class Members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles are used. Specifically, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from a Defect that can make driving unreasonably dangerous.

355.    As a result of Defendants' breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

a. An order certifying the proposed Classes, designating Plaintiffs as named representative of the Classes, and designating the undersigned as Class Counsel;

b. An order awarding Plaintiffs and class members their actual damages, incidental and consequential damages, punitive damages, and/or other form of monetary relief provided by law;

c. An order awarding Plaintiffs and the classes restitution, disgorgement, or other equitable relief as the Court deems proper;

d. Equitable relief including, but not limited to, replacement of the Class Vehicles with new vehicles, or repair of the defective Class Vehicles with an extension of the express warranties and service contracts which are or were applicable to the Class Vehicles;

e. A declaration requiring Defendants to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

f. Reasonable attorneys' fees and costs;

g. Pre-judgment and post-judgment interest, as provided by law;

h. Plaintiffs demand that Defendants perform a recall, and repair all Class Vehicles; and

i.  Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated: July 17, 2024

Respectfully submitted,

By  /s/ *Sergei Lemberg*
Sergei Lemberg
LEMBERG LAW, LLC
43 Danbury Road
Wilton, CT 06897
Phone: (203) 653-2250
Fax:    (203) 653-3424
*Attorneys for Plaintiffs*